### MATTER OF ISRAEL RUBY.

Berkshire. September 18, 1951, March 31, 1952. — April 2, 1952.

Present: QUA, C.J., WILKINS, SPALDING, & WILLIAMS, JJ.

*Attorney at Law. Bribery. Evidence*, Presumptions and burden of proof. *Practice, Civil*, New trial, Disbarment proceeding.

Conflicting evidence in a disbarment proceeding against an attorney who was also the judge of a District Court warranted a finding that a charge against the respondent of soliciting a bribe from a party to an action pending in his court had been sustained.

Cause for disbarment of an attorney may be proved by a fair preponderance of the evidence and need not be proved beyond a reasonable doubt.

A request by a lawyer for a bribe warrants his disbarment.

No error appeared in a disbarment proceeding in the denial of a motion for a new trial based on the grounds that after the trial the respondent discovered that the principal witness against him had been convicted and sentenced for "theft" thirty-three years before, and that the respondent "through mistake and inadvertence" did not use at the trial an affidavit then available to him.

A judge who heard a disbarment proceeding could not be required as matter of right to entertain a motion for a new trial based on the grounds that his decision was against the evidence and the weight of the evidence.

INFORMATION, filed in the Supreme Judicial Court for the county of Berkshire on July 26, 1950.

The case was heard by *Counihan, J.*

*J. N. Alberti*, (*M. Freedman* with him,) for the respondent.

*W. A. Garrity, Jr.*, appointed by the court to conduct the proceedings.

QUA, C.J.    Through an information filed by the Massachusetts Bar Association, and through a report of an attorney designated to conduct proceedings relative thereto, there were brought to the attention of this court a number of charges of misconduct on the part of the respondent, a member of the bar, who is also the judge of the District Court of Williamstown.    There was a trial before a single justice of this court, who made findings of fact in considerable detail.    One of the charges was "withdrawn without prejudice."    Several others were not sustained, but three of the charges were found to have been sustained by the evidence, and the single justice ordered judgment removing the respondent from the office of attorney at law.

Several of the exceptions which bring the matter to the full court are concerned with questions of evidence.    We do not discuss these exceptions, since either they have not been argued or they have no bearing on the charge which, as hereinafter appears, is the sole ground of this decision. There is, however, also an attempt to except in general without specification "to all rulings, and to all findings of fact in so far as they involve rulings" made by the single justice.    It is, to say the least, extremely doubtful whether the respondent saved any rights at all by this purported exception.    *Matter of Loeb*, 315 Mass. 191, 194–195, and cases cited.    *Commonwealth* v. *Shea*, 323 Mass. 406, 416. But as the result will be the same, we prefer to treat the record as if it presented all the questions as to the findings and rulings of the single justice relating to the charge on which this decision rests that could have been presented in this proceeding at law by exceptions properly taken.    Those questions are whether the evidence warranted the findings and whether there was error of law in the result reached

upon the findings. *Matter of Sleeper,* 251 Mass. 6, 12. *Matter of Mayberry,* 295 Mass. 155, 166. *Matter of Loeb,* 315 Mass. 191, 195–197. As to procedure in disbarment cases see *Matter of Keenan,* 313 Mass. 186, 205–207.

We need deal only with the so called King matter. As to this matter, King testified in substance as follows: In January, 1950, King brought in the District Court of Williamstown a summary process for the eviction of the tenant of a theatre owned by King. The writ was dated January 3 and was returnable January 14. On January 4 King met Ruby on the sidewalk opposite a gift shop operated by King's wife. Ruby said that he understood King had an eviction case coming up and asked whether it was going to be in the Williamstown court. King said he presumed it would be. Ruby said, "Well, I'll tell you, Cal [meaning King], if it comes up in this court, I'm a little up against it. I owe a hospital bill of approximately eight hundred dollars, and if you'll give me two or three hundred dollars for this case I'll cinch it for you." King replied that he would "take care of" Ruby and that Ruby could depend upon it. Within half an hour after this interview King reported the conversation to his attorney. On cross-examination King testified that Ruby said they would be in a position to help each other and "If you'll give me two or three hundred dollars, I'll cinch this case if it comes up before me"; that he could not quite recall if it was said that way, but "I'm in a position to help him, anyway"; that Ruby said, "We can call it a gift," and King said he would get the money for Ruby.

King further testified in substance that two days later on January 6, and again on January 7, Ruby talked with King at the gift shop; that in each conversation Ruby continued to ask for the money and King still promised to pay it, but gave excuses for delay and reported each conversation to his attorney; that early in the morning of January 9, with King's permission, a "recording device" was set up on the premises of the gift shop over which King had control (see G. L. [Ter. Ed.] c. 272, § 101); and that shortly afterwards Ruby came to the shop in response to a call from King, and

a further talk took place. This talk was recorded and was reproduced at the trial. The substance of this reproduction will be stated presently. King also testified as to what was said at this last interview in a manner not materially at variance with the recorded reproduction.

There was evidence from both King and Ruby that about five years before the events here in question "a decided coolness" (as King put it) had arisen between them because of a case which Ruby had decided against King, but there was also evidence from which the single justice could find that the previously existing friendly relations had been resumed.

Ruby testified in substance that when he said he had had to spend a lot of money for medical services King offered to let him take "a couple of hundred" and he replied that if he needed it he would be glad to ask King for it and thanked him; that he then had no knowledge that King was having any difficulty with tenants; that a couple of days later King said he was sorry he could not let him have the money then because he had a note due in a few days; and that Ruby, still not knowing of the pending action, said that if he needed the money he would be glad to ask King for it; that at a later date in response to a telephone call he stopped at the shop, and King said, "I can let you have that money if you'll take care of me" and mentioned the eviction case that was coming up; and that Ruby "became somewhat excited" and said, "What do you mean you want me to take care of you?"; that King replied, "I want you to decide in my favor"; that Ruby said, "Do you realize what you're asking me to do? Do you realize that if I did what you're asking me to do, you would be as guilty as I am? You ought to be ashamed of yourself"; and that he then walked out of the store. "In my excitement, I might have said a lot of things, but the gist of that was what was hurting." He denied ever asking King for money or telling him that he would "cinch the case for him" or that he could "call it a gift." He testified that he was excited, indignant,

and disturbed and walked out of the shop "in resentment to his insinuation." Subsequently Ruby disqualified himself from hearing the case.

The record of this final conversation in the store as reproduced without objection at the trial is confused. The two men frequently interrupted each other. The substance of it, however, consisted in King endeavoring to have Ruby repeat within range of the recording apparatus the offer which King testified Ruby had made at the first interview, in Ruby saying that he did not intend that the suggested transaction should have anything to do with the eviction case, of which he asserted he had had no knowledge, and in Ruby protesting that he would do nothing wrong. The recording does, however, contain some significant passages. In it Ruby could be found to have admitted, contrary to his testimony on the stand, that he first asked for the "loan." When charged by King with having said, if King gave him that money, "Don't worry about it" (meaning about the .action for eviction), Ruby, after again asserting his virtue, replied, "I said to you, Cal, you won't get anything the worse for it. By that I mean justice will be meted out." And again, "If that man owes it to you, you're entitled to get that verdict whether you let me take this money or not." Moreover, the recorded interview effectively contradicts Ruby's testimony on the stand that when he walked out of the shop he was excited, indignant, disturbed, and resentful. In the interview as reproduced the last things he said were, "And if you want to still make that loan to me, it's a loan and nothing else. You can think it over, but it's nothing to do anything illegal," and, "Cal — and I want to say this to you, that you won't affect my judgment of this," and, "Because I want you to — if you feel you don't want me there to sit on it, I'll have somebody else sit on it. I didn't even know it was coming in." When King said, "That's fair enough," Ruby ended the interview with "Okay, Cal." The record of this interview further discloses that at the time it took place Ruby was still ready to enter into a financial transaction with King, although he

had full knowledge of the pending action and at that time intended to hear it himself unless King should object.

It is plain without further discussion that the single justice who saw and heard the witnesses and heard the recording could believe the testimony of King, to some extent supported by the recording of the last interview. It was for him to weigh the evidence and the motives of the witnesses. He was not obliged, as against the testimony of King, to accept Ruby's contentions that the talk about money was merely about a loan that had no connection with the pending case, and that Ruby did not know the case was pending. In any event, it was immaterial whether the money was requested as a gift or as a loan. The single justice was well warranted in finding that a charge of requesting a bribe had been sustained. See G. L. (Ter. Ed.) c. 268, § 8; *Commonwealth* v. *Barker*, 311 Mass. 82.

We are urged by the respondent to overrule our decision in *Matter of Mayberry*, 295 Mass. 155, at pages 166–167, that in a proceeding for disbarment the proof need not be beyond a reasonable doubt, as it must be in criminal cases. This question was carefully considered in the *Mayberry* case, and authorities were cited in support of the rule there adopted. We see no reason for changing that rule.

It is clear that there is no error of law in disbarring a lawyer who has been found to have requested a bribe. *Matter of Keenan*, 313 Mass. 186, 216–218. *Matter of Keenan*, 314 Mass. 544, 548–549. *Matter of Ulmer*, 268 Mass. 373, 396–397. See *Matter of Loeb*, 315 Mass. 191, 198–199.

Seven and eight months respectively after the filing by the single justice of the order for disbarment the respondent filed two motions for new trial. The denial of these motions is the subject of a second bill of exceptions.

The grounds of the first motion are (1) that the respondent has now discovered that about thirty-three years before the trial the witness King had been convicted and sentenced for "theft," and (2) that the respondent "through mistake and inadvertence" did not use at the trial an affidavit which

was then available to him tending to contradict some of the testimony not relating to the matter upon which this opinion rests. Apparently the record of conviction would not have been competent evidence. G. L. (Ter. Ed.) c. 233, § 21, as amended in paragraph Second by St. 1950, c. 426. It is not clear how the affidavit would have been competent, but if it would have been, nothing prevented the respondent from making full use of it, if he had seen fit to do so. It is plain that there was no error of law in denying a motion for new trial based upon these grounds. *DeLuca* v. *Boston Elevated Railway*, 312 Mass. 495, 500–501. *Sharpe, petitioner*, 322 Mass. 441, 444–445.

The grounds of the second motion for new trial are that the decision was against the evidence and the weight of the evidence, unwarranted by the evidence, and against the law, and because the judge employed an erroneous standard as to the burden of proof. The single justice correctly ruled that after hearing the case on the facts he could not be required as matter of right to entertain a motion for new trial on the grounds that his decision was against the evidence and the weight of the evidence. *Graustein, petitioner*, 305 Mass. 571, 572, and cases cited. *Bartley* v. *Phillips*, 317 Mass. 35, 39. The only mistake of law suggested having any bearing upon the grounds upon which this opinion rests relates to the rule as to burden of proof which we have already discussed.

All exceptions are overruled, and judgment is to be entered forthwith removing the respondent from the office of attorney at law.

*So ordered.*