COMMONWEALTH *vs.* JOSEPH T. DOUGHERTY, JUNIOR
(and two companion cases[1]).

Berkshire.   September 28, 1961. — December 8, 1961.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Homicide. Conspiracy. Constitutional Law,* Search and seizure, Self incrimination, Listening device. *Eavesdropping. Evidence,* Statement of conspirator, Admissions and confessions, Listening device, Conversation in place of confinement, Record of past knowledge, Transcript. *Practice, Criminal,* Qualification of jurors. *Jury and Jurors.*

Circumstantial evidence and evidence of admissions at a criminal trial of two defendants warranted findings that they conspired with each other and with a third person hostile to a certain elderly man to beat the elderly man, and that the defendants were guilty of murder in the second degree in that they did beat the elderly man severely and that he died of the beating.   [300–301]

At a criminal trial of two defendants, evidence of incriminating statements as to conduct of both defendants made by one of them in the presence of the other when they were not under arrest and not denied by the other was admissible against both.   [301–302]

On the record of a criminal trial of two defendants a finding was warranted that a conspiracy to beat an elderly man between the defendants and a third person who was hostile to the elderly man and instigated the beating had not terminated when the defendants called on the instigator on the morning after the elderly man was beaten, and the jury might properly consider evidence of a conversation during such call in which the defendants said they had "beat up" the elderly man and needed money and that if the instigator refused it or "squealed" they would "put . . . [him] right next to . . . [the elderly man] in the grave."   [302–303]

Installation of a microphone in a police station cell block and use of the microphone to overhear a conversation between two prisoners confined in the cells, if done on the responsibility of the head of the police department, would be done "on premises under his exclusive control" within G. L. c. 272, § 101, and there would be no violation of § 99.   [304]

There was no violation of the Fourth Amendment or the Fifth Amendment to the Federal Constitution by the installation of a microphone in a police station cell block and use of the microphone to overhear and record for use in court a conversation between two prisoners confined in separate cells.   [304–305]

---

[1] The companion cases are Commonwealth *vs.* Bernard J. Kiley and Commonwealth *vs.* Bernard J. Kiley & another.

A conversation between two prisoners confined in cells in a police station, which was overheard by means of a microphone placed in the cell block and recorded by officers, was not to be excluded at the trial of the prisoners on criminal charges on the ground that not all the overheard remarks could be ascribed to one or the other of them.   [305]

At a criminal trial of two defendants, police officers who had overheard by means of a microphone and recorded a conversation between the defendants while they were confined in cells at a police station might properly be allowed in the discretion of the judge to introduce the conversation in evidence, where it was otherwise admissible, by reading the officers' transcript thereof as a record of past knowledge.   [306]

No invasion of the rights of the defendants in a criminal case was shown with respect to questionnaires sent by the probation officer to prospective jurors, whose answers gave information as to personal history which was made available to all counsel.   [306]

THREE INDICTMENTS found and returned on April 8, 1960.

The cases were tried in the Superior Court before *Quirico, J.*

*Peter J. Genovese,* for the defendant Dougherty.

*Maurice I. Lerner,* for the defendant Kiley.

*Matthew J. Ryan,* District Attorney, (*Leonard E. Gibbons,* Assistant District Attorney, with him,) for the Commonwealth.

WHITTEMORE, J.   The defendants have appealed under G. L. c. 278, § 33B, from judgments of guilty of murder in the second degree of Michael Koza and of conspiracy with each other and with Anthony Polcaro (deceased after conviction) to assault and beat Koza.

1.   There was no error in denying the motions for directed verdicts.

There was evidence, appropriately limited, when admitted, to the cases to which it applied, as follows: Polcaro was actively hostile to Koza (a man of seventy-one years) and wished to have him beaten and his limbs broken.   Polcaro met with Dougherty on October 9, 1959, and arranged for the beating, offering Dougherty $200, and later he pointed out to Dougherty the location of Koza's apartment. Dougherty said, "Don't worry, Tony [Polcaro].   I will take care of it."   Dougherty and Kiley were at a restaurant in the neighborhood on the evening of Saturday, October 10, about 8 P.M., and at that time Dougherty was convention-

ally dressed but, when observed in the same place at about 9:30 or 9:45 P.M. by the same witness, his shirt was hanging out and his hair was in disarray, so that the witness asked if he had been in a fight. Kiley was not then with him.

On Sunday, October 11, in the afternoon, the two defendants called on Eugene D. Benoit and Albert D. Luce. Dougherty in the presence and hearing of Kiley said that "they had beaten up an old man the night before." "For all I know he might be dead." "We were wearing stocking masks." Dougherty asked who knew of it other than Benoit and Polcaro, and said, "If you or anybody else says anything about it, we'll put you right next to the old man." Kiley said nothing. The defendants were seen together elsewhere on October 11. At a later meeting on October 11, in a bar, Dougherty, in Kiley's presence, said to Luce "If you know anything about what we were talking about, I'd keep your mouth shut, or we'll put you right next to the old man," and shortly thereafter when Benoit had joined the group and said to Dougherty "I want to talk to you, Joey," Kiley said to Benoit, "You won't be satisfied until you get all of us in the can." The body of Koza was found in his apartment on October 12, 1959. His death resulted from "blunt injuries." There were over fifty-two injuries on his body. He died at least sixteen hours and not over forty-eight hours prior to 4 P.M., October 12, 1959. There was evidence of human blood on wearing apparel which belonged to Dougherty and Kiley, not shown to have been worn on the evening of October 10, and evidence of admissions in conversation in the police station which was overheard by a microphone. Apart from these admissions and the testimony of human blood found on the defendants' wearing apparel there was evidence to take the cases to the jury.

The trustworthiness of witnesses who told of the talks of Kiley and Dougherty with Benoit and Luce was in issue, but the weight to be given their testimony was for the jury. Kiley, although he said almost nothing, was, in effect, admitting what Dougherty said in his presence of their crimi-

nal actions which he did not deny, and this admission was of course enough to incriminate him as a murderer and conspirator with Dougherty. His presence with Dougherty on the evening of the crime and thereafter was significant. A fortiori, there was sufficient evidence in the cases against Dougherty.

If the jury found a conspiracy on the admissions already referred to, there was, as the case was submitted, the following additional evidence against each defendant under the conspiracy indictments: The defendants called at Polcaro's home on Sunday morning. They then said that "they had beat up Mike Koza . . . they needed money to go away" and if he did not give it to them or if he squealed they would "put . . . [him] right next to Mike in the grave."

This evidence was in police officers' testimony of admissions by Polcaro. When given, the judge instructed that it was limited to the cases against Polcaro. At the close of the government's case, however, the district attorney moved orally that the court then charge the jury that all such statements could be used against all defendants. The judge said that the motion was too broad as it would include statements after arrest when the conspiracy must have ended, but that the district attorney might renew the motion with specific reference to the evidence. After the evidence closed and just before the arguments on the motions for directed verdicts the judge asked for the "list or statement of [the] evidence." The district attorney said that he then had only the page references. The judge said, "Will you prepare it and . . . give it to me as soon as you can." He also indicated that opposing counsel might have copies. The next reference to the matter in the transcript is in the judge's charge. The judge, after stating that it was for the jury to find if there was a conspiracy and when it began and ended, instructed in substance that, notwithstanding limitations placed upon the admissibility of evidence, any statement made or act done by any defendant after the making of the conspiracy, if made or done in furtherance thereof and before its objective was accomplished and the

conspiracy terminated, might be considered as evidence against all other parties to the conspiracy.

There was no objection to the charge in this aspect. In the circumstances we think that the motions for directed verdicts were argued in contemplation of such ruling as the judge might thereafter make in respect of removing the limitations on evidence, and that, on the ruling in the charge, the talk in Polcaro's house on Sunday was before the jury if it found that there was a conspiracy which had not then ended. On the evidence the jury could have so found. The jury could have found the conspiracy continuing at least through the time when the actors called on the instigator to be paid for their acts. See *Commonwealth* v. *Stuart,* 207 Mass. 563, 567.

2. The defendants upon arrest on October 13, 1959, were placed in the Pittsfield police station in cells with barred openings at the front and separated by one intervening cell. No one else was in the cell block. A microphone had been so hidden that their ensuing conversation was carried upstairs to a speaker. Officers recorded the talk and all of it was read into evidence including foul language with which the significant phrases were interspersed. These words, inter alia, were recorded: "That . . . Kincard . . . [Kenneth F. Card, Junior, was a police officer who testified to seeing Polcaro and Dougherty together on October 9] knows we did it. . . . What the . . . did he say we did it for? . . . We've been in a lot of jams and never done anything this crazy to kill somebody. . . . They can't charge us with murder until we go to court. . . . We'll beat this. Don't worry about that. . . . Hey, Joe. Yes. Didn't happen until Sunday night. They're . . . [equivalent of thwarted] right there. . . . They ain't got any proof we did it. . . . [T]hey can't charge us with murder. . . . I don't think they really got the evidence. . . . They ain't got nothing on us. Want us to plead guilty to something we didn't do. . . . What kind of evidence they holding us on? Holding us on what Polcaro said. He said we'd do the same to him, we did to the other guy. I told them I

asked him for a couple of bucks.   He said he didn't have it.
. . . [Foul characterization] knows we did it, too.''
''Ain't going to charge us no phoney murder.''

General Laws c. 272, § 99, as in force in October, 1959,
made it a penal offence to attempt to overhear (without of-
ficial permission not obtained in this case) ''spoken words
in any building by using a device commonly known as a dic-
tagraph or dictaphone . . . or any similar device or ar-
rangement . . ..''   Section 101, however, provided that
''nothing contained in this section or sections ninety-nine
and one hundred shall render it unlawful for any person to
install and use such a device on premises under his exclu-
sive control.''   See *Matter of Ruby,* 328 Mass. 542, 544.

The judge, speaking prior to *Mapp* v. *Ohio,* 367 U. S. 643,
ruled, in accordance with the then controlling cases, that
evidence, if illegally obtained, was not thereby barred.   See
*Commonwealth* v. *Wilkins,* 243 Mass. 356, 358–362, and cases
cited; *Commonwealth* v. *Noxon,* 319 Mass. 495, 543.

We need not determine to what extent the use of the
microphone in the police station would be made unconstitu-
tional by a violation of G. L. c. 272, § 99.   That statute was
not violated.   The installation was in ''premises under
. . . [the] exclusive control'' of the department, and the
exception of § 101 was applicable.   The head of the depart-
ment was the person in exclusive control and, in the ab-
sence of a showing to the contrary, he was responsible for
the installation and use of the listening device.

The use of the listening device did not violate the Fourth
Amendment.   *Olmstead* v. *United States,* 277 U. S. 438.
*Goldman* v. *United States,* 316 U. S. 129, 134.   *On Lee* v.
*United States,* 343 U. S. 747.   There was no physical inva-
sion of a constitutionally protected place, as in *Silverman* v.
*United States,* 365 U. S. 505, which distinguished and de-
clined to reconsider the earlier cases.   In the *On Lee* case,
*supra,* the petitioner's self-incriminating statements were
made (''while at large on bail pending trial,'' pp. 748–749)
in the customer's room of the petitioner's laundry, in a con-
versation with an undercover agent.   The talk was over-

heard by an agent outside the premises by means of a transmitter concealed on the person of the undercover agent.

A police station cell is for the present purpose in no respect like a house or office, barring its use for such a confidential conversation as that of an accused with counsel. That a defendant may expect to be observed and overheard is confirmed by the open front of the cell, blocked only by bars, which made possible the conversation between these defendants. Our decisions that evidence is admissible which is obtained by surreptitiously listening to conversations in a place of confinement after arrest (*Commonwealth* v. *Wakelin,* 230 Mass. 567, 574 [dictograph]; *Commonwealth* v. *Sacco,* 259 Mass. 128, 141) are unaffected by the *Mapp* and *Silverman* cases.

We discern no basis for referring to the Fifth Amendment. *Adamson* v. *California,* 332 U. S. 46, 50–54. *Olmstead* case, *supra,* p. 462 ("There was no . . . compulsion . . . . Our consideration must be confined to the Fourth Amendment"). As to evidence obtained by coercion, see *Rochin* v. *California,* 342 U. S. 165. Compare *Irvine* v. *California,* 347 U. S. 128; *Breithaupt* v. *Abram,* 352 U. S. 432.

No question of the obligation of a State to provide imprisoned defendants with a place for confidential communication is presented. See *State* v. *Lanza,* 10 App. Div. 2d (N. Y.) 315; affd. 9 N. Y. 2d 895, 10 N. Y. 2d 748; cert. granted, sub nom. *Lanza* v. *New York,* 368 U. S. 918.

Some of the overheard remarks were in the context ascribable to one defendant or the other. It is not a circumstance requiring exclusion that all could not be, for acquiescence by continuing the conversation, in a way which showed the acceptance of the implications, made the admission of the speaker also the admission of the hearer. *Commonwealth* v. *Machado,* 339 Mass. 713, 715–716. This is no less so because the replies "susceptible of being interpreted as an admission or one not likely to be made by an innocent man" (*Commonwealth* v. *Madeiros,* 255 Mass. 304, 313) were made by persons under arrest. *Ibid. Commonwealth* v. *Lucas,* 332 Mass. 594, 598.

Commonwealth *v.* Dougherty.

3. There was no error in allowing the officers to read the transcript of the defendants' talk. If present recollection was not revived (see *Guiffre* v. *Carapezza,* 298 Mass. 458) the judge, nevertheless, in his discretion could permit the witness to incorporate in his testimony the contents of "a writing expressive of his past knowledge," *Bendett* v. *Bendett,* 315 Mass. 59, 64, and allow the writing itself to be put in evidence. *Fisher* v. *Swartz,* 333 Mass. 265, 268–270. There was notice before the reading that the statement would include "strong" language and no motion was made to exclude such. Perhaps in the judge's discretion the foul language could have been excluded without material effect. See *Fisher* v. *Swartz,* 333 Mass. 265, 270. We see, however, no abuse of discretion.

There is nothing in the contention of the defendant Dougherty that the judge was obliged to instruct that the notes were incomplete, lacking in voice intonation, and may have been sarcasm or exclamation. The notes spoke sufficiently on these points.

4. There was no invasion of the defendants' rights in the use of the questionnaires which were sent by the probation officer to prospective jurors and which, as replied to, disclosed matters of personal history. The information was made available to all counsel. There is no showing of any improper influence or intimidation of prospective jurors. *Commonwealth* v. *Cero,* 264 Mass. 264, 273–276. *Commonwealth* v. *DiStasio,* 294 Mass. 273, 281–282. *Commonwealth* v. *Sherman,* 294 Mass. 379, 385–386. See *Commonwealth* v. *McCann,* 325 Mass. 510, 511.

5. There is nothing in the contention that the Commonwealth failed to establish causation. The inference was open that beatings by the defendants had caused the death even if it ensued some time later.

6. The instructions on circumstantial evidence may not be attacked because more extended and detailed than counsel thinks essential.

7. Although no exception was taken, we note that it would appear within the judge's discretion to admit the testimony of Dr. Arthur J. McBay of blood stains on wear-

343 Mass. 307                                          307

ing apparel of the defendants. The testimony was of slight force because it was not shown that the articles were worn by these defendants at the time of the crime but this went to its weight. It is to be noted that these are not now capital cases and we do not have on these appeals the broad power given by G. L. c. 278, § 33E. *Commonwealth* v. *Capalbo,* 308 Mass. 376, 385. *Commonwealth* v. *Coggins,* 324 Mass. 552, 556. *Commonwealth* v. *Vaughn,* 329 Mass. 333, 339–340.

*Judgments affirmed.*