DEPARTMENT OF PUBLIC HEALTH vs. CUMBERLAND
CATTLE COMPANY
(and three companion cases).

Suffolk.  Bristol.  April 4, 1972. — May 16, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, BRAUCHER, & HENNESSEY, JJ.

*Public Health.  Dairy Farm.  Nuisance.  Health, Board of.  Equity Jurisdiction*, Public health, Retention of suit for further relief. *Water.  Municipal Corporations*, Water supply. *Regulation.  Administrative Order.  State Administrative Procedure Act.  Practice, Civil*, Jury trial as to health order. *Evidence*, Presumptions and burden of proof. *Contempt.  Words*, "Water supply."

The provisions of G. L. c. 111, § 143-150, as amended, providing for control of noisome trades by a municipal board of health and requiring compliance with a board order pending appeal to the Superior Court, apply to a dairy farm and have not been superseded by G. L. c. 111, § 125A, inserted by St. 1958, c. 469, requiring that board orders to abate a farm nuisance under G. L. c. 111, §§ 122, 123, and 125, be suspended pending review by a District Court. [825–827]

The power of the State Department of Public Health under G. L. c. 111, § 160, to "issue such orders as in its opinion may be necessary to prevent the pollution and to secure the sanitary protection of . . . waters used as sources of water supply . . ." is based on the actual use of water rather than on the legality of that use. [827-828]

A hearing was not required preceding issuance by the State Department of Public Health, under G. L. c. 111, §§ 159, 160, as amended through St. 1951, c. 448, §§ 2, 3, of an order to the operator of a dairy farm to cease activities causing pollution of water used as a source of water supply; such order was administrative in nature and not subject to G. L. c. 30A. [828–829]

A dairy farm operator was in no position to assert that its appeal to the Superior Court under G. L. c. 111, §§ 147, 163, from an administrative order by the State Department of Public Health to cease activities causing pollution of waters used as a source of water supply was wrongfully dismissed or to defend against enforcement of the order where the operator failed to comply with the order during the appeal. [829]

Even if the State Department of Public Health, in issuing, under G. L. c. 111, § 160, an administrative order to the operator of a dairy farm to cease activities causing pollution of waters used as a source of water supply, was bound by the proviso of § 162 not to "prohibit the cultivation and use of the soil in the ordinary methods of agriculture," an unnecessary and unreasonable storage of vast quantities of solid and liquid manure in places where it

could cause pollution of such waters did not constitute an "ordinary method" of agriculture, nor did such proviso of § 162 restrict the Department in efforts to prevent the health hazards of water pollution by unreasonable, willfully improper, or negligent farming methods. [829–830]

In suits in equity brought by a local board of health and the State Department of Public Health seeking injunctive relief to compel the operator of a dairy farm to comply with water pollution abatement orders of the board and the department, the burden of proof was not greater than in any other civil case [830–831]; and the farm operator could not collaterally attack the validity of those orders in view of the statutory remedies afforded by appeals under G. L. c. 111, §§ 147, 163 [831].

Orders issued by the State Department of Public Health and by a local board of health to the operator of a dairy farm to cease activities causing water pollution were clear enough to warrant holding the operator in civil contempt for violation thereof, and a compensatory fine was not unreasonable where the orders put the operator on notice that continued violation would make the operator liable to pay a proportionate share of the cost of chlorination of water used as a source of water supply; the amount of such fine need not be measured with undue precision. [831–832]

Orders of public health officials and Superior Court decrees requiring the operator of a dairy farm to cease the "loose housing system of dairy farming" where cattle were confined and not allowed to graze in the fields and to cease other activities causing water pollution were justified in light of the operator's "irresponsible and contumacious conduct," but because of the serious economic effect of such relief on the operator, the Superior Court was to retain jurisdiction to make such modifications as it might find consistent with the public health interest, resolving any doubts in favor of that interest, and also to retain jurisdiction either to insure the operator's continued compliance or to supervise an orderly adjustment or termination of its operations on the locus. [832–834]

TWO APPEALS to the Superior Court under G. L. c. 111, §§ 147, 163, filed on October 25, 1965, and April 1, 1966.

TWO BILLS IN EQUITY filed in the Superior Court on March 30, 1966, and August 3, 1966.

The cases were consolidated for trial and were heard by *Thompson*, J.

*Allan van Gestel* for Cumberland Cattle Company.

*Walter H. Mayo, III*, Assistant Attorney General, for the Department of Public Health.

*Jarvis Hunt*, Town Counsel, for the Board of Health of North Attleborough & another.

*Max Volterra* (*Henry G. Barrett*, City Solicitor, with him) for the City of Attleboro.

CUTTER, J.   These four proceedings concern a diary farm owned by Cumberland Cattle Company (Cumberland) in North Attleborough (the town).[1]   In each proceeding, Cumberland is before us either by appeal or on a bill of exceptions, attempting to set aside a result adverse to it.   Each proceeding is described in later paragraphs.   The judge made findings adopted by him as reports of material facts in the equity suits, in which the evidence is reported.

### FINDINGS RELATING TO ALL PROCEEDINGS.

Certain findings (or facts appearing in bills of exceptions) relate to all the proceedings.   With the exception of a contempt proceeding in the case brought by the Commonwealth's Department of Public Health (the State department), all proceedings were consolidated for trial in the Superior Court and were heard together. In that joint hearing, the judge (sitting without a jury) made supported findings (dated April 29, 1968), upon which (to a great extent) the facts are stated below.

Cumberland operated a dairy farm (the locus) with about 750 head of cattle in the town.   On the farm it maintains a house and other structures, a lagoon, an impounded stream, a liquids tank, and a silo.   Part of the area owned by Cumberland is used to cultivate crops to feed the cattle.   The cattle are confined and are not allowed to graze in the fields.

The locus is within the watershed of Seven Mile River (the river, a term hereinafter used to include a tributary stream which runs through the locus).   The river, in turn, is a tributary of Orr's Pond, a source of water supply for the city of Attleboro (the city).

The judge found that Cumberland had committed the following violations of orders of the State department and the town's board of health (the town board) and the

---

[1] Indirectly related cases have been before this court.   See *Cullen* v. *Building Inspector of No. Attleborough*, 353 Mass. 671; *Cumberland Farms of Conn. Inc.* v. *Zoning Bd. of Appeal of No. Attleborough*, 359 Mass. 68.

provisions of a consent decree, all mentioned in greater detail below.

Cumberland has maintained manure piles on the locus on the river watershed and has not removed the piles promptly or controlled them properly. Top soil in the lagoon was not removed down to the level of subsoil, nor was it replaced with gravel. Cumberland has used fertilizer on the locus between November 1 and April 30 of each year without the approval of the State department. It has not continued to conduct a fly control program. It has allowed barnyard drainage to discharge into the river, which shows an increase in the coliform count as it passes through the locus. It has failed to make manure silos leak proof and to cover the liquids pit. The lagoon (which has contained liquid cow manure, a polluting substance) is within fifty feet of the river high water mark. The contents of the lagoon have overflowed into the river.

CASE No. I — CUMBERLAND'S "NOISOME TRADE" APPEAL.

The town board, on October 20, 1965, after a public hearing, "assigned" the locus "for the exercise of dairy farming" and declared the operations on the locus to be a noisome trade. G. L. c. 111, § 143 (as amended through St. 1956, c. 275, § 1). See fn. 8, *infra*. The town board issued an order imposing various conditions (two of which [2] were later waived by it).[3]

Cumberland seasonably appealed to the Superior Court

---

[2] These two were requirements (a) that Cumberland reduce its herd to 400 head, and (b) that work be stopped on a barn then under construction and the work then completed be dismantled.

[3] In general the other conditions (retained in the order) included items such as no. 3, segregation of "cows about to calf"; no. 4, keeping cattle and manure more than 200 feet from the river; no. 5, removal of dead cattle within twenty-four hours; no. 6, removal of carcasses buried within 200 feet of the river; no. 7, a continuous program of fly control; no. 8, a program of "odor masking"; no. 9, prevention of flow of barnyard drainage into the river; no. 10, postponement of herd additions and new buildings until "existing facilities . . . [could be] brought under . . . control"; no. 11, manure silos to "be made leak-proof and . . . liquid pit covered."

for Bristol County under G. L. c. 111, § 147 (as amended by St. 1948, c. 480, § 2), and asked for a jury trial. The town board filed a motion to dismiss the appeal on the ground that Cumberland continued to violate its order. See G. L. c. 111, § 148, which provides that the allegedly noisome trade "shall not be exercised contrary to the [town board's] order while such [appeal] proceedings are pending," with exceptions not here pertinent, and that "[u]pon any violation of the order . . . the proceedings shall forthwith be dismissed." See also *Board of Health of Franklin* v. *Hass,* 342 Mass. 421, 422, 424–426.

After consolidation of this appeal with the other cases, and during a joint hearing, Cumberland's attorney asked a witness on cross-examination about the basis of an order made by the State department in March, 1966 (discussed later in Cumberland's appeal from the State department order). The judge ruled (subject to Cumberland's exception) that, in the consolidated hearing, he would not permit inquiry about the basis and validity of the State department's order (at least in connection with the town board's motion to dismiss Cumberland's appeal from the town board's order). He also ruled that he would hear only the motion to dismiss and would not hear Cumberland's appeal on the merits. He later allowed the town board's motion to dismiss Cumberland's appeal. Cumberland's bill of exceptions raises only exceptions to the judge's limitation of Cumberland's inquiry and to the judge's allowance of the motion to dismiss.

CASE NO. II — THE TOWN BOARD'S EQUITY SUIT AGAINST CUMBERLAND.

On March 30, 1966, the town board (see, however, *Board of Health of Franklin* v. *Hass,* 342 Mass. 421, fn. 1) filed a bill in equity in the Superior Court for Bristol County, seeking to restrain Cumberland from continuing violation of the town board's order (see fn. 3,

*supra*), and to prevent pollution of the river and hence of the city's water supply. The city intervened. On April 5, 1966, by preliminary injunction Cumberland was directed to comply with requirements stated in the margin.[4] That decree (sometimes referred to as the consent decree) was signed by all counsel then representing the respective parties.

Subsequently, the town board filed a petition for contempt. Cumberland's answer denied the legality of the town board's order, and asserted that G. L. c. 111, § 143, has no application to a dairy farm. In the joint hearing of (a) the contempt proceeding in the town board's suit, (b) the equity suit brought by the State department (see discussion below of case no. IV), and (c) the motions to dismiss Cumberland's appeals from the State department's order (case no. III, *infra*) and the town board's order (case no. I, *supra*), the judge made findings (already summarized in the statement of facts applicable to all the proceedings). These findings, dated April 29, 1968, showed Cumberland's violation of the consent decree (see fn. 4).

Final decrees were entered on July 1, 1969,[5] (a) hold-

---

[4] Cumberland was ordered: "1. Immediately [to] remove all manure . . . from the premises and the soil in the lagoon area to sub-soil and replace the same with gravel. 2. All manure . . . must be removed . . . every 24 hours. 3. No manure . . . shall be . . . stored on any portion of the Seven Mile River watershed . . . tributary to the |c]ity . . . water supply. 4. No fertilizer shall be used on . . . the . . . watershed ·. . . during the period November 1 to April 30 and such other times as may be approved by the" State department. "5. No fertilizer shall be used . . . [in the] watershed . . . unless . . . approved by the" State department. "6. . . . Cumberland . . . shall abide by restrictions 3–12 issued by the" town board (see fn. 3, *supra*). "7. . . . Cumberland . . . shall not allow an increase of more than 50 coliforms in the brook while it crosses the" locus and "will retain an approved laboratory to sample the water twice a week and if any sample is over 50 coliforms increase . . . [will] repeat the sampling for 3 consecutive days. 8. If there shall be an increase of more than 50 coliforms . . . and if the [c]ity . . . is required by the . . . [State department] to chlorinate the water . . . Cumberland . . . shall pay its proportionate share of the cost" until further order of the court.

[5] The first final decree (apparently incorporating the town board's original order of October 20, 1965, before its modification, fn. 2, *supra*) entered July 1, 1969, ordered Cumberland to reduce its herd and to stop construction of its barn. Whether this was intentional is not altogether clear from the record.

ing Cumberland in contempt and imposing upon it a fine of $1,000 a day (and counsel fees) for violation (after July 1, 1969) of the town board's order and the consent decree, and (b) renewing the commands of the consent decree. Cumberland appealed.

CASE NO. III — CUMBERLAND'S APPEAL FROM THE
STATE BOARD ORDER.

On March 29, 1966, the State department, purporting to act under G. L. c. 111, §§ 159 and 160 (as amended through St. 1951, c. 448, §§ 2, 3),[6] ordered Cumberland "to remove forthwith all cattle from its dairy at" the locus and "to cause all cow manure and putrescible matter . . . to be removed from the [river's] watershed." Cumberland seasonably appealed to the Superior Court under G. L. c. 111, § 147, as amended, as affected by § 163 (as amended through St. 1951, c. 448, § 5).[7] After an exchange of correspondence between the State department and former counsel for Cumberland, the State department's order was modified (about May 13, 1966)

---

[6] Section 159, as amended, gives to the State department "general oversight . . . of all . . . waters *used* by any city" (emphasis supplied). As amended, § 160 reads: "The department may cause examinations of such waters to be made to ascertain their purity and fitness for domestic use, or the possibility of their impairing the interests of the public . . . or of imperilling the public health. It may make . . . regulatons and issue such orders as in its opinion may be necessary to prevent the pollution and to secure the sanitary protection of all such waters *used* as sources of water supply. It may delegate the granting and withholding of any permit required by such . . . regulations . . . to boards of health . . . in . . . towns, to be exercised by such . . . boards . . . subject to such recommendation and direction as shall be given . . . by the department; and upon complaint of any person interested, the department shall investigate the granting or withholding of any such permit, and make such orders relative thereto as it may deem necessary for the protection of the public health . . ." (emphasis supplied). Then follows a criminal penalty for violation of the orders and regulations.

[7] Section 163, as thus amended, reads (emphasis supplied): "Whoever is aggrieved by an order made under . . . [§ 160] . . . may appeal therefrom as provided in . . . [§ 147]; but such notice as the court shall order shall also be given to the . . . mayor, or chairman of the selectmen . . . interested in such order. While the appeal is pending *the order of the department shall be complied with,* unless otherwise authorized by it."

to conform with the consent decree (fn. 4, *supra*) of April 5, 1966. The department on June 14, 1967, filed a motion to dismiss Cumberland's appeal.

During the course of the combined trial, the judge, with respect to this Cumberland appeal also, made the same ruling (already mentioned above in the discussion of case no. I, Cumberland's "noisome trade" appeal). He refused to permit inquiry about the validity and basis of the State department's order. The judge ordered that Cumberland's appeal be dismissed because of its failure to comply with the consent decree, the State department's order, and the State department's regulations. Cumberland's bill of exceptions presents issues raised by the judge's rulings and order.

## CASE NO. IV — THE STATE DEPARTMENT'S EQUITY SUIT.

On August 3, 1966, the State department filed in Suffolk County a bill in equity alleging that Cumberland had not complied with the State department's regulations and with its order of March 29, 1966, as modified (see discussion of case no. III, *supra*). Injunctive relief was asked. A preliminary injunction on August 9, 1966, continued in effect a restraining order by which Cumberland was directed to refrain from violating (a) the order of March 29, 1966, as modified about May 13, 1966 (which embodies the terms of the consent decree, fn. 4, *supra*), and the department's regulations, and (b) from causing pollution of the city's water supply. This case was heard on the merits as part of the consolidated hearing of the several proceedings. The judge made the same findings, rulings, and order for decree dated April 29, 1968 (already mentioned in connection with the statement of findings applicable to all the proceedings and in the discussion of case no. II).

A petition for contempt was filed on June 14, 1968. The city and the town then were allowed to intervene. Cumberland's motion to stay the petition for contempt

was denied on April 11, 1969. On June 28, 1969, the judge (after referring to his findings of April 29, 1968) made further findings on the contempt petition, including that Cumberland (a) with "full knowledge of . . . the interlocutory decree" of August 9, 1966, "has wilfully . . . disobeyed" it; (b) "has polluted the waters of the" river which indirectly "supplies water to the [c]ity," and (c) has caused the city to "expend $77,818.72." On June 28, 1969, a final decree (more fully described below) broadly enjoined Cumberland from violating the State department's order of May 13, 1966, and its regulations. A further final decree adjudged Cumberland in contempt and ordered it to pay the city a compensatory fine of $77,818.72. Cumberland appealed from both final decrees.

Cumberland's contentions in the foregoing proceedings are individually discussed below.

1. Cumberland contends that G. L. c. 111, §§ 143–150, as amended,[8] have no application to a dairy farm, because (a) of the provisions of G. L. c. 111, § 125A (inserted by St. 1958, c. 469)[9] and (b) of the second

---

[8] Section 143 (as amended through St. 1956, c. 275, § 1) reads: "No trade . . . which may *result in a nuisance* or be harmful to the inhabitants . . . *dangerous* to the public health, or may be attended by noisome . . . odors shall be established in a . . . town except in such a location as may be assigned by the board of health thereof after a public hearing has been held thereon, subject, however, to the provisions of any . . . [zoning] by-law . . . and such board of health may prohibit the exercise thereof within the limits of the . . . town or in places not so assigned, in any event. . . . The [State] department shall advise, upon request, the board of health of a . . . town previous to the assignment of places for the exercise of any trade . . . referred to in this section, and any person . . . aggrieved by the action of the board . . . in assigning certain places . . . may, within sixty days, appeal from the assignment . . . to the department . . . [which] may, after a hearing, rescind, modify or amend such assignment" (emphasis supplied).

[9] Section 125A, as thus appearing, reads in part: "If, in the opinion of the board of health, a farm or the operation thereof constitutes a *nuisance,* any action taken by said board to . . . cause to be abated said, nuisance *under* . . . [§§ *122, 123 and 125*] shall, notwithstanding any provisions *thereof* to the contrary, be subject to . . . this section. In the case of any such nuisance a written notice of an order to abate the same within ten days after receipt of such notice shall first be given as provided in . . . [§ 124]. If no petition for review is filed . . . or upon final order of the court, . . . [the] board may then proceed as provided in . . . [§§ 122, 123, and 125] or in the order of the court.

italicized passage from G. L. c. 111, § 162 (as amended through St. 1951, c. 448, § 4), as quoted in the margin.[10] It is urged that a farmer could not long survive cessation of his operations (see c. 111, § 148, quoted above in the dicsussion of case no. I, and § 163, see fn. 7) pending an appeal to the Superior Court under c. 111, §§ 147 and 163. Cumberland refers to the legislative history of § 125A as tending to show that the Legislature intended, by what eventually became § 125A, to make that section rather than §§ 143–150, the method of health regulation of farming activities.[11]

We discussed a similar contention in *Board of Health of Franklin* v. *Hass*, 342 Mass. 421, 426.[12] Although the piggery there considered may have been more offensive than a dairy farm (even one conducted as badly as the judge found Cumberland's farm on the locus to have been run), § 125A seems relevant only to orders to abate nuisances issued under the sections expressly mentioned

If the . . . operator of said farm within said ten days shall file a petition for a review . . . in the district court for the district in which the farm lies, the operation of said order shall be suspended, pending the [court's] order. . . . [T]he court shall give notice . . . [of the petition] to . . . [the] board, shall hear all pertinent evidence and determine the facts, and upon the facts as so determined review said order and affirm, annul, alter or modify the same as justice may require" (emphasis supplied).

[10] As thus amended, § 162 reads: "Upon petition to the department by the mayor of a city or the selectmen of a town . . . stating that manure . . . or any other matter pollutes . . . the waters of any stream . . . or watercourse *used by such city* [or] town . . . as a source of water supply, the department shall appoint a time and place . . . for a hearing, and after notice . . . and a hearing, if in its judgment the public health so requires, shall, by an order served upon the party causing or permitting such pollution, prohibit the deposit . . . or discharge of any such cause of pollution, and shall order him to desist therefrom and to remove any such cause of pollution; *but the department shall not prohibit the cultivation and use of the soil in the ordinary methods of agriculture if no human excrement is used thereon*" (emphasis supplied).

[11] For the legislative history see petition of the Massachusetts Farm Bureau accompanied by 1958 House Doc. No. 751; 1958 House Bill No. 2886; 1958 Senate Bill No. 671; and St. 1958, c. 469. See also Report of a special commission (Res. 1957, c. 76) found in 1958 Senate Doc. No. 680, at pp. 9–10.

[12] See also *Board of Health of Woburn* v. *Sousa*, 338 Mass. 547, 553; *Pendoley* v. *Ferreira*, 345 Mass. 309, 312–315; *Moysenko* v. *Board of Health of No. Andover*, 347 Mass. 305, 307–308.

(see fn. 9, *supra*).   In the *Hass* case, we held § 125A irrelevant in considering an order issued under § 143 and related statutes.   We think that § 143, and §§ 146–150, have not been superseded by § 125A, and that these sections have clear application to a dairy farm operated in such a way as to "result in a nuisance" (fn. 8), particularly when this is done after notice of its offensiveness, as in the present case.   Cumberland's difficulties arise from a gross failure to comply with reasonably imposed conditions (see fns. 2, 3, 4, *supra*), which by their terms show an obvious and close relationship to the objectives of § 143.   See discussion of procedure in *Revere* v. *Blaustein*, 315 Mass. 93, 95.   There is no adequate basis for treating this dairy on a different basis than the piggery discussed in the *Hass* case.   General Laws c. 111, § 1 (as amended through St. 1966, c. 217), classifies the keeping and raising of both swine and cattle as "farming" or "agriculture."   See G. L. c. 128, § 1A (as appearing in St. 1960, c. 181).

2. Cumberland contends that, because of noncompliance by the city (of Attleboro) with St. 1892, c. 56, § 1, and St. 1910, c. 468, § 1, special statutes authorizing the city to use the waters of the river for its water supply, these waters have not become a "water supply" under G. L. c. 40, §§ 38–42, as amended.   On the basis of this unduly narrow interpretation of "water supply" Cumberland argues that the State department has no power under G. L. c. 111, § 160, to prevent and restrict use of the locus as a farm simply to avert pollution of the river waters.   We need not, and do not, now consider whether the city has in fact complied with the provisions of the 1892 and 1910 special statutes.   It seems to be established that the river's waters are in fact being used by the city as a water supply and that they are being polluted seriously by Cumberland.   The power to prevent pollution under G. L. c. 111, §§ 159–175, as amended, is based on the actual use of water by a city rather than on the legality of that use.   See especially §§ 159, 160, 162, fns. 6, 10, *supra.*   If Cumberland has any claim

for compensation because of the restriction of the use of the locus for farming, that claim is irrelevant in these proceedings.

3. Cumberland contends that the State department's order of March 29, 1966, was illegally issued, because Cumberland was not given notice and a hearing prior to issuance of the order. The contention seems to be (a) that the order constituted a "regulation" under G. L. c. 30A, §§ 1 (5), 2, and (b) that the issuance of the order was in an "adjudicatory proceeding." See c. 30A, §§ 1 (1), 10, 11.

The State department alleged in its bill in case no. IV that, pursuant to G. L. c. 111, § 160 (see fn. 6), and other applicable statutes, it had prescribed general regulations which became effective on June 1, 1961. See G. L. c. 30A, § 5.[13] The judge in his findings in effect assumed the existence of these regulations.

Such general regulations differ from administrative orders based upon particular violations of applicable statutes or general regulations. The State department's direct order to Cumberland, now before us, does not appear to us to be a "regulation" in the sense of a "rule, regulation, standard or other requirement of *general* application and future effect" (emphasis supplied). See G. L. c. 30A, § 1 (5), inserted by St. 1954, c. 681, § 1 (see amendments by St. 1969, c. 808, § 2; St. 1970, c. 712, § 2), and §§ 2, 3.[14] At most the order given under G. L. c. 111, § 160 (fn. 6), is an administrative direction. Until it is appealed from, or an enforcement effort is undertaken, there is no proceeding, adjudicatory or otherwise, pending before the State department. Chapter 111, § 160, contains no requirement of a hearing

---

[13] Cumberland's answer does not admit this allegation, which Cumberland (pleading ignorance of the facts) called on the State department to prove. In its brief, however, Cumberland appears to concede the existence of the 1961 regulations, although it .contends that they are vague and inapplicable.

[14] Chapter 30A, § 5 (see amendments by St. 1969, c. 808, § 5; St. 1970, c. 712, § 3), makes endorsement by the State Secretary of the filing of such a regulation in his office "prima facie evidence of compliance with all regulation-making . . . requirement[s] imposed by law."

before an order is issued.   See *Commonwealth* v. *Sisson*, 189 Mass. 247, 250–254.   Also, since no adjudicatory proceeding was taking place when the order was issued, c. 30A, §§ 10 and 11, relating to adjudicatory proceedings, can have no application.

The statutory method of appeal from such an administrative order is under G. L. c. 111, § 147, as amended, which is incorporated by reference in § 163 (fn. 7). That appeal, however, is made not to the department but to the Superior Court.   Accordingly, the provisions of G. L. c. 30A, § 14 (as amended by St. 1957, c. 193, § 1; see later amendment by St. 1968, c. 637, § 1), governing judicial review of adjudicatory proceedings, have no application (except "as to standards for review").   This is an instance "[w]here . . . [a special] statutory form of judicial review . . . is provided."

One of the provisions of the prescribed statutory review under § 147 and § 163 (fn. 7) is that "the order of the department shall be complied with" during the pendency of the appeal.   Cumberland did not comply and now is in no position to assert that its appeals were wrongly dismissed or to defend against enforcement of the order.   See also § 148, already quoted.

Cumberland also contends that the State department should have acted under c. 111, § 162, rather than § 160, and that, if the department had done so, it would have been bound by the second italicized language of § 162, as quoted in fn. 10, *supra*, which does not appear in § 160. We note first that § 162 in terms applies only to departmental action upon petitions by persons such as mayors and selectmen (fn. 10).   The State department here appears to have acted on its own motion under § 160. Even if we were to conclude that such italicized language of § 162 could apply in some degree to the State department's orders under § 160, it would not help Cumberland. The judge's findings of fact suggest that Cumberland's failure to comply with the State department's order involved polluting action or inaction hardly consistent with "ordinary methods of agriculture."   We would be

slow to hold that the unnecessary and unreasonable storage of vast quantities of solid and liquid manure, in places where it can cause pollution of streams nearby, constitutes an ordinary method of agriculture. Cf. the zoning situation considered in *Jackson* v. *Building Inspector of Brockton*, 351 Mass. 472, 476–479, where we pointed out (at p. 477) that "the record reveals no detrimental consequences of [the] dehydration of fodder" there considered. That decision also discloses no health or pollution hazards from the manufacture or use of the dehydrated manure discussed in that case. Such italicized language at § 162 (as quoted in fn. 10, *supra*) cannot fairly be read as restricting the State department in efforts to prevent the health hazards of water pollution by unreasonable, wilfully improper, or negligent farming methods.

4. The judge properly ruled that the State department's and the town board's burden of proof in the equity proceedings brought by them, respectively, was not greater than in any civil case, viz., "by a fair preponderance of the evidence or by fair weight of the credible and believable evidence." The equity suits sought only specific or injunctive civil relief. There was no effort to impose criminal penalties. Our cases concerning the burden of proof in civil controversies have rarely suggested any intermediate burden of proof between that usual in civil cases and that applicable in criminal cases. See *Grella* v. *Lewis Wharf Co.* 211 Mass. 54, 58–60; *Matter of Mayberry*, 295 Mass. 155, 167; *Mishara* v. *Albion*, 341 Mass. 652, 654–656 (cited in *Swartz* v. *Sher*, 344 Mass. 636, 639, which is not to the contrary, despite a somewhat obscure sentence by the present author). See also *Matter of Ruby*, 328 Mass. 542, 547; Leach and Liacos, Handbook of Massachusetts Evidence, pp. 42–43; Wigmore, Evidence (3d ed.) § 2498; Hughes, Evidence § 25. For reasons stated by Chief Justice Qua in the *Mayberry* case, such intermediate standards of proof in civil cases should not be extended. We regard the language in *Poulos* v. *Poulos*,

351 Mass. 603, 606, as consistent with the *Mayberry* case.

5. The judge correctly ruled that, in the equity cases, Cumberland could not attack the validity of the orders of the State department and the town board, respectively. The statutory appeals under G. L. c. 111, §§ 147 and 163, were the proper methods of appeal. Because of Cumberland's serious violations of the orders, these appeals cease to be available and correctly were dismissed. See *Revere* v. *Blaustein*, 320 Mass. 81, 83. See also c. 111, § 148; *Swansea* v. *Pivo*, 265 Mass. 520, 523.

6. We perceive no such obscurity in the orders issued by the State department and the town board as would make it inequitable to hold Cumberland for civil contempt. The State department's order and that of the town board each seem to us to constitute a "clear and unequivocal" command. See *United States Time Corp.* v. *G. E. M. of Boston, Inc.* 345 Mass. 279, 282. The judge's findings establish "clear and undoubted disobedience" of those orders. *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 36–37.

Cumberland complains, in effect, that the compensatory fine assessed against it in the State department's contempt proceeding was unreasonable and not shown by evidence to be related causally to acts of Cumberland after the date of the decree alleged to have been disobeyed. On April 5, 1966, Cumberland had signed the consent decree in the equity suit brought by the town board (see discussion of facts of case no. II, *supra*). The city's construction of water purification facilities (the basis of the compensatory fine) was commenced after April 5, 1966, but before the date of the preliminary injunction obtained on August 9, 1966, by the State department in its equity suit.

As already noted, the injunction issued on August 9, 1966, continued in effect a restraining order of August 3. This in turn ordered Cumberland to refrain from violating the State department's order of March 29, 1966 (as modified on May 13, 1966). This modified order

embodied the consent decree of April 5, 1966. Thus, in these consolidated proceedings, there was as early as April 5, 1966, a definite command to Cumberland which put it on notice that it must so conduct itself on the locus as to prevent the coliform content in the river from increasing by more than 50 coliforms as the stream crosses the locus. Cumberland then was put on notice that, in the event of a violation, it would become liable to pay a proportionate share of the cost of chlorination. The city of Attleboro was an intervener in the equity suit by the town board, case no. II.

The judge was justified by the evidence in concluding that the construction (begun in July, 1966) of the city's facilities for chlorinating and purifying the river water was caused in substantial measure by Cumberland's pollution, despite testimony that such action had been recommended by Paul T. Anderson of the State department as early as April, 1966, and that there were other potential causes of the river's pollution, such as surface drainage from streets and roads. There was a continuing course of conduct by Cumberland in violation of clear health commands after the consent decree which justified the civil contempt order finally issued. The compensatory fine is only "measured in some degree by the pecuniary injury caused by the act of disobedience." See *Root* v. *MacDonald,* 260 Mass. 344, 362 (quoting *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418, 443–444). The amount of a compensatory fine upon "[o]ne who has disobeyed a decree" need not be measured with undue precision. *Godard* v. *Babson-Dow Mfg. Co.* 319 Mass. 345, 350.

7. Cumberland complains that the orders and the several decrees amount to shutting down its farm on the locus. The orders and decrees, particularly par. 1 of the final decree in the State department's equity suit, do preclude Cumberland from pursuing its practice of not allowing its cows to graze in the fields in accordance with what is referred to in the records as the "loose housing system of dairy farming." This practice might

have been continued unhampered, if Cumberland had taken any pains or care at all to obey the reasonable provisions (designed to prevent pollution) set out in the consent decree and in the State department's modified order. Cumberland, despite its serious disobedience of the consent decree, continues to insist, in effect, that the final decrees, particularly in the State department's suit, are too broad and burdensome in various respects.

Cumberland's irresponsible and contumacious conduct has been such as to justify broad remedial relief of the type which has been granted. Nevertheless, because of the serious economic effect upon Cumberland, it is appropriate to direct the Superior Court to retain jurisdiction of the State department's suit to permit Cumberland a reasonable time to sustain both the burden of proof and the burden of persuading the court of its ability and intention to control its operations on the locus by strict compliance with the State department's and the town board's orders (as from time to time they may be modified). This will require immediate observance of all restrictions in the consent decree and the final decrees, other than the provisions of the first paragraph of the final decree in the State department's suit. If Cumberland is able to convince the Superior Court that there will be such compliance, and furnishes such security to ensure compliance as the court may require, that court may grant reasonable modification of the provisions of par. 1 of the final decree in the State department's suit. Such a modification may permit the "loose housing system of dairy farming" to continue on the locus,[15] but only to

---

[15] The judge's subsidiary findings concerning the causal connection between (1) Cumberland's use of the "loose-housing system" (as compared with usual grazing practices) and (2) the pollution now enjoined are less complete than would have been desirable. In any further hearings on modification of the decree there should be developed a full record on this aspect of the case followed by detailed subsidiary findings, so that the record may show to what extent Cumberland's violations are an inevitable consequence of use of the "loose-housing system" and not merely the result of Cumberland's poor management controls and negligent or wilful violation of good health and dairy practices.

such extent as the court may find to be consistent with the public health and interest. Any such modification shall be subject to such terms and conditions as the court may impose. Any doubts are to be resolved in favor of the public health interest.[16]

If any modification of the final decrees (see fn. 16) is permitted, the Superior Court is to retain jurisdiction to ensure Cumberland's continued compliance. See e.g. *Nassif* v. *Boston & Maine R.R.* 340 Mass. 557, 566–567; *Coan* v. *Assessors of Beverly*, 349 Mass. 575, 579. The Superior Court, in any event, may also exercise jurisdiction to permit and supervise an orderly adjustment or termination of Cumberland's operations on the locus in the light of the decrees in the equity suits, subject to appropriate terms and conditions to be determined by the Superior Court. See *Chesarone* v. *Pinewood Builders, Inc.* 345 Mass. 236, 242–243.

8. Subject to the provisions of the preceding part 7 of this opinion allowing later modification, the final decrees and the contempt decrees in the equity suits are affirmed. In both appeals initiated by Cumberland, the exceptions are overruled. In the equity suits the State department and the town board are to have costs of appeal.

*So ordered.*

---

[16] Cumberland may be able to sustain the burden of establishing that, in practical operation, other provisions of the final decree in the State department's suit or of the final decree in the town board's suit are ambiguous so as to require modification, or are no longer necessary or appropriate (because of changed conditions or otherwise). If so, the Superior Court may allow appropriate modification of such other provisions. In the event of any such modification of either equity decree, there should be explicit findings of the facts leading to such modification.