STATE OF NORTH CAROLINA v. MARION HOWARD BUNDRIDGE

No. 75

(Filed 24 January 1978)

1. **Criminal Law §§ 5, 29— mental capacity to stand trial—insanity at time of crime—tests**
    In determining a defendant's capacity to stand trial, the test is whether he has capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel so that any available defense may be interposed; on the other hand, when an accused enters a plea of not guilty by reason of insanity, the test of his mental responsibility is the capacity of defendant to distinguish between right and wrong at the time of and in respect to the matter of investigation.

2. **Criminal Law § 5.1— evidence of insanity—exclusion improper—no prejudice**
    An order entered by the trial judge declaring defendant mentally incapacitated and unable to proceed to trial was some evidence of defendant's mental condition and was admissible on the question of his insanity; however, the trial court's exclusion of this evidence was not prejudicial error since the trial judge's order was based largely upon the testimony of a doctor who testified for defendant at trial, and the testimony of this doctor, another expert witness and lay witnesses placed before the jury a complete history and description of defendant's mental condition.

3. **Criminal Law § 113.8— "guilty by reason of insanity"—erroneous instruction—no prejudice**
    Defendant was not prejudiced by the trial court's instruction to the jury that they could possibly return a verdict of "guilty by reason of insanity," since the error was so obvious that the jury could not possibly have been misled by it; the trial judge on three separate occasions charged to the effect that

State v. Bundridge

if the jury found that defendant did not have mental capacity to know right from wrong, the jury should return a verdict of not guilty; and the trial judge submitted correct written issues to the jury.

**4. Robbery § 5— possible verdicts—erroneous instructions—no prejudice**

Where the trial judge instructed the jury with respect to armed robbery that the possible verdicts were "guilty, not guilty by reason of insanity or guilty," defendant was not prejudiced by the judge's failure to submit the possible verdict of "not guilty," since the court had just given proper instructions as to the possible verdicts, and the jury, at all times during their deliberations, had written issues before them which correctly gave the possible verdicts which they might return.

**5. Criminal Law §§ 5, 119— acquittal by reason of insanity—commitment procedures—instructions not limited to request—no error**

Defendant's contention that the trial judge erred by fully instructing on the commitment procedures applicable to a defendant acquitted by reason of insanity when defendant only requested that the court instruct on the existence of such procedures is untenable, since the instructions given were favorable to defendant, and, further, to limit the instructions as defendant requested would create unanswered questions which would confuse, rather than assist, the jury in reaching a verdict.

**6. Criminal Law § 66.9— pretrial photographic identification—no impermissible suggestiveness—in-court identification proper**

Though the State was unable to produce at trial photographs used in a pretrial identification procedure and though there was some contradictory evidence as to whether defendant or his alleged accomplice were both identified in the first identification procedure conducted by officers, such evidence did not disclose a photographic procedure so impermissibly suggestive as to violate defendant's constitutional right to due process; but even if the pretrial photographic identification of defendant was impermissibly suggestive, the robbery victim's in-court identification of defendant would have been properly admitted into evidence, since the victim had ample opportunity to observe the robber in good light both before and during the attack and the victim identified defendant independent of any pretrial identification procedure.

**7. Criminal Law § 42.3— blood-stained clothing—connection with crime—admissibility**

In a prosecution for armed robbery and assault with a deadly weapon the trial court properly allowed into evidence items of clothing taken from defendant's residence, though there was no evidence that defendant had worn those clothes on the night of the assault and no evidence that the stains on the clothes were human blood of the same type as that of the victim, since the victim had been assaulted in such a manner that one might reasonably expect the assailant's clothing to be spattered with blood, and, within a short time after defendant had been implicated, clothing apparently covered with fresh blood was found in his apartment.

Justice Exum dissenting.

APPEAL by defendant from *Howell, J.*, 14 February 1977 Schedule "B" Criminal Session of MECKLENBURG Superior Court.

Defendant was charged in separate bills of indictment with armed robbery and assault with a deadly weapon with intent to kill inflicting serious injuries. The charges were consolidated for trial. At arraignment, defendant stood mute, and the court entered a plea of not guilty for defendant in each case.

The State offered evidence tending to show that about 9:00 p.m. on 4 October 1975, Grady Lawrence Williams encountered David Adams in downtown Charlotte. Adams introduced Williams to defendant, Marion Howard Bundridge, and the three of them walked together to a railroad trestle near the intersection of 5th and 6th Streets. At that place, defendant seized Williams, placed a sharp instrument to his throat, and commanded that Williams give him his money. After Williams gave Adams his wallet and money, defendant cut Williams' throat, stabbed him in the back, and cut him around the head, shoulders, and chest. Williams testified that the place where he met defendant was in front of the Jiffy House on West Trade Street which was a well-lighted area. He further stated that he never lost consciousness during the time he was being assaulted by defendant. An unidentified lady called the police, and he was taken to the hospital where a severed windpipe and other wounds were sutured. His left arm was partially paralyzed as a result of the assault.

Later, on the night of 4 October 1975, police officers went to defendant's residence and after identifying themselves entered the residence at defendant's invitation. They observed blood-stained trousers, a blood-stained coat, and shoes which appeared to be spotted with fresh blood. These items of clothing were taken by officers with defendant's consent.

Defendant did not testify but offered expert testimony which indicated that he suffered from paranoid schizophrenia. He also offered testimony of lay witnesses who testified to certain irrational acts including statements by defendant that the government subjected him to laser beams in an attempt to control his mind. The lay witnesses also testified that, in their opinion, defendant was suffering from some sort of mental disorder.

The jury returned verdicts of guilty of armed robbery and guilty of assault with a deadly weapon with intent to kill inflict-

ing serious injuries. Defendant appealed from judgment sentenc-
ing him to life imprisonment for armed robbery and twenty years
on the charge of assault. The judgment in the assault case provid-
ed that the sentence imposed therein would run concurrently
with the sentence in the robbery case.

*Rufus L. Edmisten, Attorney General, by Thomas H. Davis,
Jr., Associate Attorney, for the State.*

*Lila Bellar, for the defendant appellant.*

BRANCH, Justice.

Defendant assigns as error the ruling of the trial judge which
sustained the State's objection to the admission of Judge Grist's
order of 30 January 1976 finding defendant mentally in-
capacitated and incapable of proceeding to trial. It is defendant's
position that, since he had the burden of proving his insanity to
the satisfaction of the jury, it was prejudicial error to deny him
the benefit of this recent adjudication. In support of his position,
he relies on *State v. Duncan,* 244 N.C. 374, 93 S.E. 2d 421 (1956),
and cases there cited.

In *Duncan,* the defendant was tried upon an indictment
charging him with murder. Upon arraignment, it was suggested
to the court that the defendant was insane and without sufficient
mental capacity to understand his defense or to receive sentence
upon his conviction. The trial judge, pursuant to G.S. 122-84, im-
paneled a jury and held an inquisition concerning the defendant's
mental condition. An issue was submitted to and answered by the
jury as follows: "Is the defendant insane and without sufficient
mental capacity to undertake his defense or to receive sentence in
this case? Answer: Yes." The trial judge committed the defendant
to the state hospital for treatment and further ordered that if his
sanity be restored he be returned to the Chatham Superior Court
for trial. This adjudication was offered into evidence at trial, and
the court sustained the State's objection. Holding this ruling to be
prejudicial error, this Court speaking through Justice Parker
(later Chief Justice) in part stated:

> The rule is well established that in criminal cases, when
> insanity is relied on as a defense, an adjudication declaring
> the defendant to be an insane person made prior to the al-
> leged offense or subsequent to the alleged offense for which

the defendant is being tried is not conclusive of the insanity of the defendant at the time of the inquisition, and is admissible in evidence for the consideration of the jury on the issue as to whether or not he was insane when the offense was committed, provided the time of the adjudication bears such relation to the person's condition of mind at the time of the crime as to be worthy of consideration in respect thereto. [Citations omitted.] 244 N.C., at 378, 93 S.E. 2d, at 423.

One of the cases cited in *Duncan* and relied upon by defendant is *McCully v. State*, 141 Ark., 450, 217 S.W. 453 (1920). There the defendant entered a plea of not guilty by reason of insanity and in the course of the trial, he sought to introduce a record of the probate court showing that he had been committed to an insane asylum approximately a year before. The court did not permit the introduction of the evidence and, in finding error in this ruling, the Supreme Court of Arkansas, *inter alia*, declared:

"When insanity is relied on as a defense to a crime, great latitude is allowed in admitting evidence having any tendency to throw light on the mental condition of the defendant at the time of the commission of the crime. *** It is competent to go into the mental condition of the prisoner both before and after the commission of the act. . . ."

\*   \*   \*

Such inquisitions, it thus appears, are simply received as a part of the evidence for the consideration of the jury, they are not conclusive of the fact adjudged, and the matter is still left open for the jury to determine from all the facts adduced as to whether the prisoner was insane at the time of the alleged offense. 141 Ark., at 451-452, 217 S.W., at 454.

[1] The State agrees that a judicial adjudication of insanity prior or subsequent to the alleged offense is admissible but contends that Judge Grist's order finding that defendant's mental condition was such that he could not proceed to trial did not come within this rule. To buttress its argument, the State points to the difference between the standard for determining defendant's capacity to stand trial and determining whether an accused was legally insane when he committed the crime. In determining a defendant's capacity to stand trial, the test is whether he has capacity

to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel so that any available defense may be interposed. On the other hand, when an accused enters a plea of not guilty by reason of insanity, the test of his mental responsibility is the capacity of defendant to distinguish between right and wrong at the time of and in respect to the matter of investigation. *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968).

Although *Duncan* and *McCully* consistently refer to the insanity of the accused, we note that in *Duncan* the evidence rejected grew out of an inquiry pursuant to G.S. 122-84 as to whether defendant had sufficient mental capacity to proceed to trial. We also note that in *McCully* the reported case only recites that the evidence rejected was a record that the defendant had been committed to an insane asylum. The pertinent portion of G.S. 122-84 provides that, "When a person accused of the crime of murder . . . shall be found by the court to be without sufficient mental capacity to undertake his defense or to receive sentence after conviction, the court before which such proceedings are had shall detain such person in custody until inquisition shall be had in regard to his mental condition. . . . When a person committed to a state facility under this section as unable to plead shall have been reported by the facility to the court having jurisdiction as being mentally able to stand trial and plead, the said patient shall be returned to the court to stand trial as provided in G.S. 122-87." This was the action taken by Judge Grist. Judge Grist's actions were consistent with the provisions of this statute.

*Duncan* differs from instant case in that an issue was submitted to a jury. However, it is now settled that when there are proceedings under G.S. 122-84, determination may be made by the court with or without a jury. *State v. Propst, supra.* Here it seems clear that Judge Grist proceeded under the mandate of G.S. 15A-1002 and held a hearing consistent with the provisions of G.S. 122-84. Although there was no declaration of insanity in instant case, the purpose and resulting orders were the same as in *Duncan* and *McCully*. We are therefore unable to validly distinguish the holdings in *Duncan* and *McCully* from instant case as to the *admissibility* of this evidence.

[2] Further, it is well established in this jurisdiction that in criminal cases, every circumstance that is calculated to shed any

light upon the supposed crime is admissible into evidence. *State v. Sneeden*, 274 N.C. 498, 164 S.E. 2d 190 (1968). Likewise, our courts have allowed wide latitude in admitting evidence having a tendency to throw light upon the mental condition of a defendant who has entered a plea of not guilty by reason of insanity. For example, we allow opinion evidence by lay witnesses and lay testimony reciting irrational acts prior or subsequent to the alleged offense. *State v. Potts*, 100 N.C. 457, 6 S.E. 657 (1888); 1 Stansbury's North Carolina Evidence, Section 97 (Brandis Rev. 1973) [hereinafter cited as Stansbury]. We are, therefore, of the opinion that the order entered by Judge Grist declaring defendant mentally incapacitated and unable to proceed to trial was *some* evidence of defendant's mental condition and was admissible on the question of his insanity. We emphasize that when such evidence is admitted, the trial judge should clearly instruct the jury that this evidence is not conclusive but is merely another circumstance to be considered by the jury in reaching its decision.

However, under the circumstances of this case, we do not find the ruling of the trial judge to be prejudicial error. Judge Grist's order was based largely upon the testimony of Dr. Groce who testified for defendant. Dr. Groce's testimony, the testimony of another expert witness, and the testimony of lay witnesses placed before the jury a complete history and description of defendant's mental condition. In view of the evidence admitted concerning defendant's mental condition, we are unable to discern that any real prejudice to defendant resulted from the exclusion of Judge Grist's order.

Defendant next contends that the trial judge committed prejudicial error in his charge to the jury. We will consider the two portions of the charge under attack separately.

[3] The trial judge charged the jury that if "you should further find to your satisfaction that the defendant at the time charged, and in regard to the particular act charged, did not have mental capacity or ability to distinguish right from wrong, or to understand the nature and consequences of his acts, he would not be responsible and it would be your duty to return a verdict of *guilty by reason of insanity* with respect to any particular charge, to which you found the State has proved beyond a reasonable doubt the defendant committed." [Emphasis ours.] This part of the charge was clearly error. In fact, it was such obvious error that

we are disposed to believe that any reasonably intelligent person would not believe that under our system of justice an accused could be convicted of a crime "by reason of insanity." We assume that the jury was made up of reasonably intelligent persons. Further, the trial judge on three separate occasions charged to the effect that if the jury found that defendant did not have mental capacity to know right from wrong, the jury should return a verdict of not guilty.

Additionally, the trial judge submitted written issues to the jury as follows:

ISSUES (75CR58429)

## INDICTMENT I

1. With respect to assault with a deadly weapon with intent to kill inflicting serious injury, is the defendant (guilty) (not guilty by reason of insanity) or (not guilty)?

\*   \*   \*

ISSUE (75CR58430)

## INDICTMENT II

1. With respect to the charge of robbery with a dangerous weapon, do you find the defendant (guilty) (not guilty by reason of insanity) or (not guilty)?

These issues were in possession of the jury during the time they considered and deliberated upon their verdict. The written issues therefore effectively precluded a verdict of guilty by reason of insanity.

Although we are bound by the record, we are constrained to observe that in view of diligent counsel's failure to call this clearly erroneous statement to the attention of the trial judge and in light of the lack of anything tending to show that the jury was confused, there is a strong probability that there was error in recording the charge.

[4]   In his instruction on the armed robbery charge, the trial judge stated: "With respect to Indictment II you may enter one of three verdicts: guilty, not guilty by reason of insanity or guilty." Unquestionably, defendant was entitled to have all permissible

verdicts submitted to the jury under proper instruction. *State v. Griffin*, 280 N.C. 142, 185 S.E. 2d 149 (1971). Here the judge erroneously failed to submit the possible verdict of "not guilty." However, immediately prior to this misstatement, he had correctly charged and submitted the possible verdict of not guilty as to the armed robbery charge. Even so, we think that this error might have been prejudicial except that, at all times during their deliberations, the jury had written issues before them which correctly gave the only possible verdicts which they might return.

Under these circumstances and upon considering the charge contextually, as we must, we are of the opinion that these isolated errors in the charge did not mislead the jury in its search for a verdict which spoke the truth.

[5]  Defendant's third assignment of error is as follows:

III. The trial court committed prejudicial error by charging the jury as to the commitment procedures under North Carolina law applicable to the defendant by reason of his alleged mental illness whereas defendant merely requested that the court charge as to the existence of such procedures.

Defendant submitted a written request for special instructions which included a request that the court "instruct the jury of the existence of commitment procedures under North Carolina law applicable to a defendant acquitted by reason of mental illness."

In *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976), we held that when a defendant interposes a defense of insanity and requests an instruction setting out the procedures for commitment set forth in G.S. 122-84.1, it is prejudicial error for the court not to give such instructions. The gist of G.S. 122-84.1 is that the trial judge shall hold a defendant who is acquitted on the grounds of insanity for further hearings to determine whether he is imminently dangerous to himself or others. In *Hammonds*, the Court reasoned that failure to give such instructions was prejudicial because the jury might tend to return a verdict of guilty so as to ensure that the accused would be incarcerated for the safety of the public and for his own safety.

Defendant's position that the trial judge erred by fully instructing on the commitment procedures when he only requested

that the court instruct on the *existence* of such procedures is patently untenable. The fallacy in defendant's argument is that the instructions given were favorable to him. Further, to so limit the instructions would create unanswered questions which would confuse, rather than assist, the jury in reaching a verdict.

[6] Defendant also assigns as error the denial of his motion to suppress the in-court identification of defendant by the victim and the ruling admitting testimony concerning the photographic identification procedures.

Upon defendant's motion to suppress the in-court identification of defendant, the trial judge conducted a *voir dire* hearing to determine its admissibility. The victim, Grady Lawrence Williams, testified that on the night of 4 October 1975 he encountered David Adams who in turn introduced him to defendant. This encounter took place in a well-lighted area in front of the Jiffy House located on West Trade Street in Charlotte. The three men then walked to the interesection of Cedar and Fifth Streets where the assault and robbery occurred. The assault took place under a nearby train trestle in an area which was well lighted by street lights and lights on the trestle. During the assault, Williams did not lose consciousness and was able to observe defendant's face. He testified, "As long as I live, I will never forget him (defendant)." After the assault, he was taken to Memorial Hospital where sometime later Officer Mullis arrived with several photographs. Williams stated that he picked out the photograph of Adams but that he did not see a photograph of defendant at that time. Approximately a month later Detective Kerr visited Williams in the rehabilitation center and showed him a group of photographs. Williams was able to pick out photographs of both Adams and defendant. He said that neither of the officers had suggested that he should pick out any of the photographs shown to him or had told him which photograph to select. Williams specifically testified, "My identification today in the courtroom is based upon sighting these two men that attacked and robbed me."

Officer Mullis testified that on the evening of the assault, he visited Williams in the emergency room and obtained a description of the assailants. A day or so later Officer Mullis again visited Williams, this time to have Williams look at seven or eight photographs, one of which was of defendant. Williams was unable

to speak but indicated with a nod of his head that he recognized defendant as the man who had stabbed him. According to Mullis, there was no picture of Adams in the first group of photographs shown to Williams. He further testified that he had been sub-poenaed that day to bring the photographs to court but was unable to do so because he did not know where the photographs were. Officer Mullis also corroborated Williams' testimony concerning the lighting conditions in the area of the assault.

Detective W. F. Kerr testified that on 5 October 1975, he questioned Adams who admitted his part in the robbery and implicated defendant Bundridge. Bundridge was picked up and photographed. The detective then sent Officer Mullis to the hospital with seven photographs including pictures of Adams and Bundridge. He further testified that upon returning, Officer Mullis reported that Williams had identified both Adams and Bundridge. In November, Kerr himself took the same photographs to the rehabilitation center where Williams unhesitatingly identified both Adams and Bundridge from the group of photographs. He did not tell Williams that there was a picture of someone who might have robbed him. Neither did he tell him whom to pick out. Kerr further stated that he had not seen the photographs since he gave them to one of the solicitors at a preliminary hearing. Upon examination of the court, Detective Kerr said that Officer Mullis did not have Adams' picture during the first photographic identification session with Williams. This witness also gave testimony which corroborated Williams' testimony as to the lighting at the scene of the assault and robbery.

Defendant Bundridge testified as to his confinement in a mental hospital and said he went to bed about nine or ten o'clock on the night of 4 October 1975 and remained there until he was awakened by the police.

At the conclusion of the *voir dire* hearing, the trial judge found facts consistent with those above recited and concluded:

1. That the pretrial identification procedures conducted by the police in this case were uncoordinated; no proper record was made of the results thereof; that the photographic evidence used is not available to this court, due to mishandling;

2. That notwithstanding the pretrial identification procedures conducted, or attempted to be conducted by the police in this case, there were no procedures of whatever nature which were so impermissively suggestive as to taint or affect the witness Williams' identification of the defendant in this case.

3. That the witness's identification of the defendant, Marion Bundridge, in this courtroom on this the 15th day of February 1977, is based upon the witness's observation of Marion Bundridge at West Trade Street and on Sixth Street in the City of Charlotte at or about 10:00 p.m. on October 4, 1975, and is not tainted by any suggestion when he saw him at any preliminary hearing, in any possible photographic identification immediately after the incident on October 5th or at a later date when he was at a hospital, or at any pretrial hearing, and consequently the "in-court" identification of the defendant, Marion Bundridge, is of independent origin, based solely upon what the witness saw at the time of the offense and does not result from any out-of-court confrontation or from any photograph or from any pretrial identification procedures conducive to mistaken identification.

The court thereupon denied defendant's motions to suppress the identification testimony.

It is well established that a "photographic lineup" is an acceptable basis for an in-court identification. *Simmons v. U.S.*, 390 U.S. 377 (1968); *State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972). However, if the pretrial identification procedures are "so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification," the evidence is inadmissible as a matter of constitutional law. *Simmons v. U.S.*, *supra*, at 384. *See also, Foster v. California*, 394 U.S. 440 (1969); *State v. Rogers*, 275 N.C. 411, 168 S.E. 2d 345 (1969), *cert. denied*, 396 U.S. 1024 (1970). It is equally settled that in-court identification of a defendant by a witness who was a party to such an unconstitutional pretrial identification procedure must be excluded unless it is first determined by the trial judge, on *voir dire*, that the in-court identification has an origin independent of the invalid pretrial procedure. *U.S. v. Wade*, 388 U.S. 218 (1967); *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974), *modified as to death sentence*, 428 U.S. 902 (1976).

In instant case, the fact that the State was unable to produce the photographs at trial and the presence of some contradictory evidence as to whether defendant or his alleged accomplice were both identified in the first procedure makes the photographic identification procedures less than exemplary. However, there was clear and uncontradicted evidence that approximately seven pictures of black males were presented to Williams on two different occasions. On each occasion, he made an identification without any suggestion by the police officers. We are of the opinion that this record does not disclose a photographic procedure so impermissibly suggestive as to violate defendant's constitutional right to due process.

Even were we to hold that the pretrial photographic identification of defendant was impermissibly suggestive, the in-court identification of defendant would nevertheless have been properly admitted into evidence. At the conclusion of the *voir dire* hearing, Judge Howell found, *inter alia*: (1) Williams had the opportunity to see and did see defendant after they had been first introduced; (2) that defendant accompanied Williams for more than six blocks; (3) that the assault took place in a well-lighted area; (4) Williams had ample opportunity to see his assailant during the assault; and (5) that independent of any photograph, previous encounter, or other pretrial procedure preceding trial, Williams had identified defendant as his assailant. There was ample competent evidence to support these findings of fact, and we are bound by them. *State v. Henderson, supra; State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974). These findings in turn support the Court's conclusion that "the in-court identification of the defendant, Marion Bundridge, is of independent origin, based solely upon what the witness saw at the time of the offense and does not result from any out-of-court confrontation or from any photograph or from any pretrial identification procedures conducive to mistaken identification." We therefore hold that the trial judge properly admitted both the in-court identification of defendant and the testimony concerning the photographic identification procedures.

[7] Finally, defendant contends that the trial judge erred by admitting into evidence items of clothing taken from defendant's residence. He argues that these items were of no probative value since the State failed to show that defendant had worn the clothes on the night of the alleged crime or that the stains on the

clothes were human blood of the same type as that of the victim Williams.

It is well settled in this jurisdiction that in a criminal case, any evidence which sheds light upon the supposed crime is admissible. *State v. Hamilton*, 264 N.C. 277, 141 S.E. 2d 506 (1965), *cert. denied*, 384 U.S. 1020 (1966). Evidence meets the test of relevancy if it has any logical tendency, however slight, to prove a fact in issue. 1 Stansbury, Section 77. The elasticity of the standard of admissibility of evidence based on relevancy is well stated in the following quote:

> ... In attempting to express the standard more precisely, the Court has emphasized the necessity of a *reasonable*, or *open and visible*, connection rather than one which is remote, latent, or conjectural, between the evidence presented and the fact to be proved by it, at the same time pointing out that the evidence need not bear *directly* on the issue and that the inference to be drawn need not be a *necessary* one. .... 1 Stansbury, Section 78, p. 237.

Admittedly, it would have been better for the State to have introduced evidence tending to show that defendant had worn these clothes on the night of the assault and to have introduced evidence of chemical analysis of the stains. The absence of such evidence does not, however, eliminate the relevance of the evidence. The victim in instant case had been assaulted in such a manner that one might reasonably expect the assailant's clothing to be spattered with blood, and, within a short time after defendant had been implicated, clothing apparently covered with fresh blood was found in his apartment. Under these circumstances, the "connection" of the clothing to the crime is a reasonable one. Thus, the challenged evidence is a link in a chain of circumstances which would permit, but not require, the jury to draw an inference that defendant's clothes became bloodstained during the assault. Both the clothing and the opinion testimony of Officer Rankin to the effect that the stains were blood were therefore admissible into evidence. *See, e.g., State v. Henry*, 51 W.Va. 283, 41 S.E. 439 (1902). See also, 3 Wharton's Criminal Evidence, Section 612 (13th ed. 1973). That there was no direct evidence showing that defendant had in fact worn this clothing during the assault goes to the weight of the evidence rather than to its admissibili-

ty. *See, e.g., Commonwealth v. Dougherty,* 343 Mass. 299, 178 N.E. 2d 584 (1961).

Even had the evidence been without probative value, we fail to perceive how its admission was prejudicial to defendant. The record discloses that when the clothes were displayed to the jury, only a few, brown, faded stains were visible. The admission of this evidence might well have mitigated the testimony of Officer Rankin that the clothes were "covered with blood." Certainly we see nothing gory or inflamatory in the introduction of this evidence, particularly when compared with the account of the senseless and vicious assault upon the victim.

We have carefully considered this entire record and find nothing to justify disturbing the verdicts or the judgments.

No error.

Justice EXUM dissenting.

I cannot agree that the error in sustaining the state's objection to the admission of Judge Grist's 30 January 1976 order was harmless. Defendant had the burden of proof on his insanity defense—always a heavy burden in a criminal trial. Judge Grist's order finding defendant mentally incapable of proceeding to trial was, as the majority recognizes, probative of the issue and should have been admitted. It is true that defendant offered other evidence on the question. Who knows, however, how much evidence it takes to persuade a jury? They might well have been persuaded by the evidence offered plus the evidence which defendant should have been allowed to offer but which the trial judge improperly kept out.

In both *State v. Duncan,* 244 N.C. 374, 93 S.E. 2d 421 (1956) and *McCully v. State,* 141 Ark. 450, 217 S.W. 453 (1920), this kind of error was held prejudicial entitling defendant to a new trial. I vote for a new trial in this case.