IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-1034

Filed 19 December 2023

Wake County, Nos. 15CRS219491-92, 15CRS219539-40, 15CRS219654-55

STATE OF NORTH CAROLINA

v.

KENDRICK KEYANTI GREGORY, Defendant.

Appeal by defendant from judgments entered 4 August 2021 by Judge Thomas H. Lock in Wake County Superior Court. Heard in the Court of Appeals 31 October 2023.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Zachary K. Dunn, for the State-appellee.*

*Thomas, Ferguson & Beskind, LLP, by Kellie Dorise Mannette, for defendant-appellant.*

GORE, Judge.

Defendant Kendrick Keyanti Gregory appeals from the trial court's judgments entered upon his conviction for first-degree murder, three counts of robbery with a dangerous weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree sexual offense, first-degree rape, first-degree kidnapping, two counts of assault with a deadly weapon with intent to kill, and possession of a firearm by a felon. Consistent with the jury's verdicts, the trial court imposed a sentence of life imprisonment without possibility of parole, and consecutive

sentences totaling 616-800 months' imprisonment. The trial court arrested judgment on one count of robbery with a dangerous weapon and the first-degree kidnapping conviction. Defendant gave oral notice of appeal in open court. This Court has jurisdiction to hear this appeal pursuant to N.C.G.S. §§ 15A-1444 and 7A-27(b).

The instant appeal is centered on the trial court's limitation on defendant's cross-examination of Dr. Nicole Wolfe (the State's expert witness in forensic psychiatry), and the trial court's denial of defendant's request for a special jury instruction on insanity. We discern no error in the trial court's judgments.

**I.**

The facts of defendant's underlying crimes are mostly undisputed and hold no relevance to the issues now before us. Nonetheless, considering the severity of defendant's crimes, it is appropriate to present a summary for context.

**A.**

In the evening hours of 30 August 2015, defendant stole two vehicles from different locations around Raleigh, North Carolina — first a Pontiac Grand Prix from the Mini City Market, then a BMW 328 from the Royal India restaurant.

Around 9:00 a.m. the next morning, detectives from the Raleigh Police Department ("RPD") were called to the Knights Inn motel on reports of a shooting. Defendant had shot Lenin Peraza after watching Mr. Peraza pull cash out of his wallet and purchase items at a nearby Exxon station. Video surveillance footage confirmed defendant was the shooter. The footage showed defendant pulling Mr.

Peraza into a stairwell, taking money from his pocket, and then leaving in a blue BMW.

That same day, RPD received a call about a shooting at the Mini City Market. The 911 call reported that someone in a red shirt, later identified as defendant, had shot someone, and was running towards the Food Lion located in the same shopping center. Officer D.P. Patterson responded to the scene and noticed people screaming in front of a business called "Mr. Pawn." When Officer Patterson arrived at the business, he could "see the victim laying down in the doorway." The victim, later identified as Thomas Durand, died from his injuries. Defendant had shot Mr. Durand in the back of the head and stolen his gun.

A few minutes after leaving Mini City Market in the stolen BMW, defendant drove a short distance away and kidnapped a fifteen-year-old girl, J.D., from outside of her home. J.D. recognized defendant as she had seen him the previous day "staring at [her] most of the time" while she was riding bikes in her neighborhood with her friends. As J.D. walked home, now alone, defendant again approached her, "came up and put his arms around [J.D.'s] neck and told [her] [that she] would have to come with him." Defendant took J.D. to the stolen BMW and drove away. While driving, defendant showed J.D. the two handguns that he had in the car and told her "[t]hat he had murdered somebody at the pawnshop."

After driving for a while, the pair arrived at an apartment complex that was unknown to J.D. Defendant forced J.D. into the woods behind the apartment

complex; he vaginally raped J.D., unsuccessfully attempted anal penetration, and then vaginally raped her again. Defendant was "hyped up" and told her that she would have his child. The pair then returned to the stolen BMW, and defendant drove J.D. back to her apartment complex. As defendant dropped J.D. off, he told her that "if [she] told somebody what happened, he would come back because he knew where [she] stayed."

Later that evening, defendant robbed a clerk at the International Food Store. During this robbery, defendant fired a shot at a clerk who chased him, but no one was hurt.

On 1 September 2015, defendant was arrested in New York City after police stopped a stolen car being driven by defendant. Defendant was extradited back to North Carolina.

**B.**

Shortly after being arrested, defendant was committed to Central Regional Hospital for an examination on his capacity to proceed. Defendant was found incapable to proceed on 6 February 2018 and was involuntarily committed. On 19 February 2020, the State moved to have defendant forcibly medicated, if necessary, to restore his capacity. On 5 March 2020, the trial court convened a hearing pursuant to *Sell v. United States*, 539 U.S. 166, 156 L. Ed. 2d 197 (2003), to determine whether to restore defendant's capacity to proceed via forced medication.

At the hearing, and as is relevant here, the State called Dr. Nicole Wolfe to

testify regarding defendant's mental illnesses. Dr. Wolfe, a forensic psychiatrist at Central Regional Hospital, testified that she first examined defendant in late 2017 to determine whether he was competent to proceed to trial; she determined that he was not. Dr. Wolfe thereafter examined defendant twice more: once in April 2018 and again in January 2020. During the April 2018 evaluation, defendant was medicated, and Dr. Wolfe determined that defendant was able to proceed to trial. However, at the January 2020 evaluation, defendant was unmedicated, and Dr. Wolfe determined that he was no longer able to proceed to trial.

Speaking about defendant's then-current mental state in March of 2020, Dr. Wolfe stated:

> [PROSECUTOR]: And, finally, I want to talk about what's medically appropriate for the defendant. You know, aside from restoring him to capacity, what, in your opinion, is in his best interests just regarding his health?
>
> [DR. WOLFE]: Treatment of his psychotic condition is medically appropriate.
>
> [PROSECUTOR]: And why is it appropriate that he receive antipsychotic medications against his will? Go through that cost-benefit analysis for us, if you would?
>
> [DR. WOLFE]: Well, he's not going to spontaneously improve without treatment. The other thing is that there are significant risks with lack of treatment, and psychotic people do unpredictable actions, and sometimes that's dangerousness to self or others. So untreated psychosis can lead to suicide, not uncommonly, and it can also lead to aggression.

The hearing was continued, and before it concluded, defendant began taking his

medication voluntarily.

**C.**

Defendant's trial began on 6 July 2020. The State presented dozens of witnesses in its case in chief, and six witnesses in rebuttal. Among the State's rebuttal witnesses was Dr. Wolfe, who was admitted at trial as an expert in forensic psychiatry and psychology.

*1.*

On direct examination, Dr. Wolfe's opinion was that in 2017, defendant exhibited symptoms of psychosis, schizophrenia, and mania, and was not capable of proceeding to trial. Defendant was then kept at Central Regional Hospital for a process called "capacity restoration," where he was given psychiatric treatment to target symptoms that were interfering with his capacity to proceed. Dr. Wolfe deemed defendant capable to proceed in April 2018.

Shortly after making that determination, the State asked Dr. Wolfe to "render an opinion about defendant's mental state at the time of the offense," 31 August 2015. When rendering an insanity determination regarding defendant's mental state when he committed his crimes, Dr. Wolfe reviewed "a compilation of understanding the mental illness, what was present, and looking at anything at the time of the offense." Dr. Wolfe interviewed defendant numerous times between 17 and 27 April 2018, produced a report of her findings (the "2018 Report"), and noted "several things that [defendant] said . . . that made [her] suspicious of some of his symptom reporting. Dr.

Wolfe referred defendant to another physician who confirmed her suspicions that defendant was feigning or malingering some of his symptoms.

Dr. Wolfe "suspected malingered or feigned mental illness" in 2017 when she first evaluated defendant, "even when he was psychotic just based on his symptom presentation" and, after consulting his full psychiatric history, learned that "there were many psychiatrists who suspected that he was malingering or claiming symptoms for a secondary gain." Dr. Wolfe questioned defendant's self-reported symptoms of hallucinations, and defendant also admitted to Dr. Wolfe that he would sometimes "go on suicide watch" so he could "get more food," which Dr. Wolfe testified is "sort of an admission to malingering."

Dr. Wolfe also testified about defendant's incarcerations shortly before 30 August 2015. Defendant was incarcerated on 1 August 2015 at the Wake County Detention Center but displayed "no odd behavior" and "no self-report. So he didn't see mental health because his behavior seemed pretty unremarkable." The 2018 Report was admitted into evidence without objection from defendant. Dr. Wolfe's underlying conclusion in the 2018 Report was that defendant's "mental illness did not prevent him from understanding the nature and quality or wrongfulness of his actions."

**2.**

On cross-examination, defendant's counsel began recounting Dr. Wolfe's findings in her 2017, 2018, and 2020 reports. Defense counsel asked about a January

2020 evaluation of defendant. At that time, Dr. Wolfe determined that defendant was again incapable of proceeding to trial and recommended a high dose of an antipsychotic medication to restore his competency. Shortly thereafter, the following colloquy regarding the 5 May 2020 *Sell* hearing occurred:

> [DEFENSE COUNSEL]: So after you wrote [the January 2020] report, you testified at another hearing in this case; is that correct?
>
> [DR. WOLFE]: I don't remember.
>
> [DEFENSE COUNSEL]: Well, this will be a hearing about whether or not it might be necessary to have forced medication?
>
> [DR. WOLFE]: Oh, okay. That. Yes.
>
> [DEFENSE COUNSEL]: And there's a procedure when somebody –
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Sustained.

Outside the presence of the jury, defense counsel asked whether he was permitted to go "into anything about the *Sell* hearing." The State confirmed that its objection was based on defendant's counsel asking about forced medication, and the court confirmed, "that was the basis for the [c]ourt's ruling." However, the trial court did not bar defendant from asking Dr. Wolfe about her testimony at the *Sell* hearing, "as long as [defense counsel does not], in your questions, make reference to forced medications, I would think that line of questioning would be appropriate." After hearing a proffer, the State renewed its objection to defense counsel, "talk[ing] about

- 8 -

a *Sell* hearing or any forcible injections." After hearing from the defense, the trial court ruled that "the probative value of that line of questioning" regarding forced medication "is minimal. But to the extent that it is relevant, that upon apply[ing] the balancing test required by 403, the [c]ourt does find that the probative value of the line of questions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

After the trial court sustained the State's objection, defense counsel resumed asking Dr. Wolfe "about a hearing that occurred in March of 2020" — the *Sell* hearing. Defense counsel asked Dr. Wolfe to review a verbatim transcript of her testimony at the *Sell* hearing, and asked her multiple questions about her testimony in that proceeding, including the following:

> [DEFENSE COUNSEL]: If you looked at page 144 [of the *Sell* hearing transcript], did you testify that you believe that medication can restore [defendant's] competency?
>
> [DR. WOLFE]: It sounds like something I would have said.
>
> . . .
>
> [DEFENSE COUNSEL]: And you also said at the bottom of page 144, going through 115, "Without medication, I do not believe that [defendant] would regain capacity without antipsychotic medication"?
>
> [DR. WOLFE]: That is correct.
>
> [DEFENSE COUNSEL]: And 115, you also said, "Seen him in both a state where he was capable of proceeding to trial and where he is not, and it is a pretty drastic difference in terms of how he communicates, organizes his thoughts, and interacts with others"?

[DR. WOLFE]:  Yes.

Defense counsel continued questioning Dr. Wolfe about her testimony at the *Sell* hearing and an April 2021 report she produced about defendant's competency to proceed.  Dr. Wolfe also outlined the differences between her diagnosis in 2017 and her testimony at trial:

> Diagnostically, some of the difference that – some of the things that came into play that are slightly different than 2017 is I didn't have the full breadth of the family history, the reports from friends, a lot of these criminal reports, and all these other treatment records.  So the diagnosis of the psychotic disorder, it does appear that there are psychotic symptoms that started in 2014 and they appeared to have full manifested into a very consistent state in 2017.  And the other thing that I didn't diagnose more than 2017 but that's quite relevant is antisocial personality disorder.  And that's something that is a more longstanding type of behavior that somebody engages in, in terms of the way they choose to live their life.  And by having all of these additional records, I was able to see his pattern – longstanding pattern of manipulative behavior, callousness, that way preceded the development of any psychotic symptom.

Dr. Wolfe admitted that she did not write a report which contained the words "antisocial personality disorder," and explained that "wouldn't be necessary because it doesn't really change the opinion, which is that he doesn't have a mental disease or defect that stops him from being able to understand what he was doing at the time." Reviewing her records, Dr. Wolfe confirmed that defendant had not taken anti-psychotic medication from roughly 8 July 2015 through his arrest in New York after the crimes in question.

**D.**

At the charge conference, the parties agreed that the pattern jury instruction regarding insanity, N.C.P.I. – Crim. 304.10, should be given. The pattern instruction includes the following statement regarding release from a mental facility after being found not guilty by reason of insanity:

> A defendant found not guilty by reason of insanity shall immediately be committed to a State mental facility. After the defendant has been automatically committed, the defendant shall be provided a hearing within 50 days. At this hearing the defendant shall have the burden of proving by a preponderance of the evidence that the defendant no longer has a mental illness or is no longer dangerous to others. If the court is so satisfied, it shall order the defendant discharged and released. If the court finds that the defendant has not met the defendant's burden of proof, then it shall order the inpatient commitment continue for a period not to exceed 90 days. This involuntary commitment will continue, subject to periodic review, until the court finds that the defendant no longer has a mental illness or is no longer dangerous to others.

N.C.P.I. – Crim. 304.10. In addition to this standard language, defendant requested in writing that the trial court add a subsequent paragraph to the pattern jury instruction, as follows:

> No matter how much time has passed since the crime, a defendant who committed a violent homicide "will be presumed dangerous to others" and has a "high hurdle" and "difficult burden" to overcome this presumption. Even years after the crime, when the court considers a mentally ill defendant's dangerousness, the probative value of a violent homicide *far outweighs* the fact that the crime happened years or decades ago. Thus, during a civil commitment hearing, the judge will always consider a

- 11 -

defendant's prior violent crime and the defendant faces a difficult burden to prove he is not dangerous to others.

The State objected to the addition of the paragraph, while acknowledging some past cases where prosecutors had, during closing arguments, prejudicially misrepresented the term of a defendant's involuntary commitment upon a finding of not guilty by reason of insanity. The State disclaimed any intention to make such an argument in this case. After some consideration, the trial court declined to give defendant's requested special instruction.

During closing arguments, the State did not make any argument that defendant could be released within a short period of time. Defendant's counsel made arguments, without objection, consistent with the special instruction that the trial court declined to give. Defense counsel explained to the jury that when someone is "found not guilty by reason of insanity, they are sent to a secured location at a mental hospital." Defense counsel argued that the mental hospital would "never cure [defendant's] disease. Never. That's not a possibility." Defense counsel further stated:

> [defendant is] going to be [at a mental hospital] for a long, long time, if not forever. Because they can take into account not only the fact that he's been untreated in an uncurable disease that he will also have, but in deciding whether he's a danger, we look at what events that have happened beforehand. And they will look at the fact what happened beforehand was that somebody got killed, somebody was sexually violated, and there were violent robberies. All of that was going to be taken into consideration. It's going to prevent him from getting out.

The jury returned verdicts finding defendant guilty on all charges.

## II.

### A.

Defendant argues the trial court abused its discretion in limiting cross-examination of Dr. Wolfe regarding the *Sell* hearing, and specifically, her testimony that defendant needed to be forcibly medicated to regain his capacity to proceed. Defendant asserts "the inability of the defense to cross-examine Dr. Wolfe on her position regarding forced medication severely impaired their ability to undermine her opinion on insanity." We disagree.

In this case, Dr. Wolfe was the State's expert witness who rebutted defendant's defense of insanity. Dr. Wolfe testified, that in her opinion, defendant was mentally ill, malingering his symptoms, and was fully able to appreciate his conduct during the crimes committed. When defense counsel attempted to impeach Dr. Wolfe with her testimony from the *Sell* hearing, the State objected, and after a proffer, the trial court sustained the State's objection to the line of questioning under Rule 403 grounds.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "The principal purpose of confrontation is to secure to the defendant the right to test the evidence of the witnesses against him through cross-examination." *State v. Mason*, 315 N.C. 724, 729

(1986) (citing *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347 (1974)). "However, the right of cross-examination is not absolute and may be limited in appropriate cases." *Id.* at 730 (citation omitted).

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19 (1985) (per curiam). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683 (1986).

"In general, we review a trial court's limitation on cross-examination for abuse of discretion. If the trial court errs in excluding witness testimony showing possible bias, thus violating the Confrontation Clause, the error is reviewed to determine whether it was harmless beyond a reasonable doubt." *State v. Bowman*, 372 N.C. 439, 444 (2019) (citations omitted).

As a preliminary matter, defendant does not explain how the fact that a *Sell* hearing occurred, or that defendant may have been subject to forced medication, was probative in any way. *See State v. Young*, 368 N.C. 188, 212 (2015) ("Evidence has 'probative value' if it 'tends to prove or disprove a point in issue.'") (quoting *Probative*

- 14 -

*Evidence,* BLACK'S LAW DICTIONARY (8th ed. 2004)). The issue of forced medication was not before the jury, and defendant concedes he was not forcibly medicated because he "began taking his medication voluntarily."

After the trial court sustained the State's objection, defense counsel resumed asking Dr. Wolfe "about a hearing that occurred in March of 2020" – the *Sell* hearing. Defense counsel asked Dr. Wolfe to review a verbatim transcript of her testimony at the *Sell* hearing and asked her multiple questions about her testimony in that proceeding. Dr. Wolfe explained the differences between her diagnosis in 2017 and her testimony at trial, noting that her initial diagnosis was made without the benefit of additional records.

It is true that findings of incapacity to proceed are generally admissible evidence when a defendant asserts insanity as a defense, and "when such evidence is admitted, the trial judge should clearly instruct the jury that this evidence is not conclusive but is merely another circumstance to be considered by the jury in reaching its decision." *State v. Bundridge*, 294 N.C. 45, 51 (1978). However, this is not a case where the trial court refused to admit such evidence. To the contrary, witness testimony "placed before the jury a complete history and description of defendant's mental condition." *Id.* The jury was aware that: (i) defendant was not medicated at the time of his crimes; (ii) defendant was deemed incompetent to proceed to trial by Dr. Wolfe at various times; (iii) defendant was prescribed medication by Dr. Wolfe, and others, to help treat defendant's mental illnesses; and (iv) Dr. Wolfe previously

testified that medication was not only medically appropriate, but also necessary for defendant to maintain competency to proceed to trial. Although the trial court prohibited defense counsel from mentioning the *Sell* hearing or forced medication specifically, defendant was not limited in attacking Dr. Wolfe's credibility or asking about the differences between her previous testimony at the hearing and her subsequent testimony at trial.

Presuming, *arguendo*, facts that a *Sell* hearing occurred and that the State may have sought to forcibly medicate defendant were broadly relevant and had some probative value on defendant's plea of not guilty by reason of insanity, the trial court did not abuse its discretion in its determination that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." N.C.G.S. § 8C-1, Rule 403 (2022). Further, defendant's assertion that "the jury was deprived of the information about [Dr. Wolfe's] bias . . . at least in part due to her belief that he was a danger to others when he was unmedicated" lacks any real substantive support in the record.

**B.**

Next, defendant argues the trial court erred by declining to give his requested special jury instruction on commitment procedure. We disagree. Defendant properly preserved this issue for appellate review. *See* N.C.R. App. P. 10(a)(2). We review errors "challenging the trial court's decisions regarding jury instructions . . ." de novo." *State v. Osorio*, 196 N.C. App. 458, 466 (2009).

At the charge conference, the parties agreed the pattern jury instruction regarding insanity, N.C.P.I. – Crim. 304.10, should be given, including, upon defendant's request, an instruction on commitment procedure. Defendant also requested an additional instruction paragraph that reads, in part, "a defendant who committed a violent homicide 'will be presumed dangerous to others' and has a 'high hurdle' and 'difficult burden' to overcome this presumption." Defendant's trial counsel admitted this was "a unique instruction," and there were "no cases where [the requested paragraph has] been given." Defendant requested the instruction be given because, *inter alia*, "it's consistent with the law" and not including it could be "misleading to the jury."

"[U]pon request, a defendant who interposes a defense of insanity to a criminal charge is entitled to an instruction by the trial judge setting out *in substance* the commitment procedures [now provided for in N.C.G.S §§ 15A-1321 and -1322], applicable to acquittal by reason of mental illness." *State v. Hammonds*, 290 N.C. 1, 15 (1976) (emphasis added). "This Court has recognized that the preferred method of jury instruction is the use of the approved guidelines of the North Carolina Pattern Jury Instructions." *Caudill v. Smith*, 117 N.C. App. 64, 70 (1994), *disc. rev. denied*, 339 N.C. 610 (1995). Generally, a requested jury instruction should be given when "(1) the requested instruction was a correct statement of the law and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested and (4) such failure

likely misled the jury." *Liborio v. King*, 150 N.C. App. 531, 534 (citation omitted), *disc. rev. denied*, 356 N.C. 304 (2002).

Here, the pattern jury instruction on commitment procedures, N.C.P.I. – Crim. 304.10, sufficiently encompasses the substance of the law. *See State v. Allen*, 322 N.C. 176, 198–99 (1988) ("The trial court gave the pattern jury instruction in N.C.P.I. – Crim. 304.10 which informed the jury of the commitment hearing procedures in N.C.G.S. §§ 15A-1321 and -1322, pursuant to article 5 of chapter 122C. This instruction adequately charged the jury regarding procedures upon acquittal on the ground of insanity.").

Defendant offers no compelling argument or authority to support his assertion that the pattern jury instruction, as written, was "incomplete" or "misleading" "in the context of this case." Our Supreme Court adopted the rule requiring an instruction on commitment procedures precisely because the "fear for the safety of the community could motivate a jury to insure that a defendant will be incarcerated for his own safety and the safety of the community at large." *Dalton*, 369 N.C. 311, 321 (Jackson, J., concurring) (cleaned up). Here, defendant interposed a defense of insanity to criminal charges based upon, in his own words, "a series of violent and dangerous acts." Defendant's case is neither so exceptional nor extraordinary such that the pattern jury instruction on commitment procedures fails to adequately encompass the law or risks misleading the jury. The uniquely abhorrent nature of defendant's criminal conduct does not entitle him to unique instruction on matters beyond the jury's

consideration. Accordingly, we discern no error in the trial court's decision to deny defendant's request for an additional jury instruction.

## III.

For the foregoing reasons, we discern no error in this case. The trial court did not abuse its discretion in limiting cross-examination of Dr. Wolfe, and defendant's confrontation rights were not violated. Further, the trial court did not err in declining to give defendant's requested special instruction to the jury.

NO ERROR.

Judge STADING concurs.

Judge HAMPSON dissents by separate opinion.

No. COA22-1034 – *State v. Gregory*

HAMPSON, Judge, dissenting.

In my view, it was an abuse of discretion constituting error to exclude cross-examination of Dr. Wolfe on the purpose of her testimony at the *Sell* hearing where Defendant's defense in this case was premised solely on a plea of insanity. In particular, the trial court erred by not permitting cross-examination on Dr. Wolfe's opinion offered at the 2020 *Sell* hearing concerning the medical appropriateness of Defendant receiving "antipsychotic medications against his will[.]"

Our Supreme Court in *Bundridge* acknowledged:

> it is well established in this jurisdiction that in criminal cases, every circumstance that is calculated to shed any light upon the supposed crime is admissible into evidence. *State v. Sneeden*, 274 N.C. 498, 164 S.E.2d 190 (1968). Likewise, our courts have allowed wide latitude in admitting evidence having a tendency to throw light upon the mental condition of a defendant who has entered a plea of not guilty by reason of insanity. For example, we allow opinion evidence by lay witnesses and lay testimony reciting irrational acts prior or subsequent to the alleged offense.

*State v. Bundridge*, 294 N.C. 45, 50-51, 239 S.E.2d 811, 816 (1978).

Moreover, that Court has also recognized:

> North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C–1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on*

> *North Carolina Evidence* § 42 (3d ed.1988) (footnotes omitted) (citations omitted).

*State v. Bacon*, 337 N.C. 66, 88, 446 S.E.2d 542, 553 (1994). No rationale could apply to otherwise limit a Defendant's cross-examination of the State's experts.

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974).

> A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

*Id.* at 317, 94 S. Ct. at 1110, 39 L. Ed. 2d 347.

Here, Dr. Wolfe's testimony indicated she "had suspected malingered or feigned mental illness in 2017 even when [Defendant] was psychotic just based on his symptom presentation, which was quite atypical." At Dr. Wolfe's 2018 evaluation, Dr. Wolfe testified Defendant "clearly exceeded the threshold for feigned psychotic

symptoms." As the majority points out, the gist of Dr. Wolfe's trial testimony was that she suspected Defendant was malingering or feigning symptoms of mental illness as early as 2017 and eventually, upon a subsequent review of records, determined that, in her opinion, was in fact the case, even though she agreed Defendant suffered from mental illness. Nevertheless, in 2020, Dr. Wolfe not only testified that Defendant required medication to restore his competency but also testified as to why forced medication of Defendant to treat his mental illness was medically appropriate to prevent Defendant from being a danger to himself and others. The jury, however, was not permitted to hear the motivation—to compel forced medication of Defendant—for Dr. Wolfe's 2020 testimony.

The motivation for Dr. Wolfe's testimony in 2020 was quite clearly probative both of Dr. Wolfe's credibility and Defendant's mental condition. Indeed, Defendant's case hinged on the fact that while Defendant had sporadically received mental health treatment since at least 2014, Defendant was unmedicated at the time of the offenses in 2015 and, thus, incapable of knowing the nature and quality of his actions or the wrongfulness of his acts as result of his mental illness. Dr. Wolfe's testimony that not only was Defendant responsive to medication but that she advocated for Defendant to be forcibly medicated for his own health and protection and to restore his competency was certainly relevant and probative material for cross-examination.

Moreover, there is no rationale for excluding this piece of evidence under Rule 403(b). First, the jury was permitted to hear practically everything else from and

about the 2020 *Sell* hearing, except perhaps the most important part: the context in which it was held. Surely if the jury could hear evidence of the contents of that hearing as bearing on Defendant's mental health, the context of that hearing was just as probative to throw light on Defendant's mental condition. *See Bundridge*, 294 N.C. at 50-51, 239 S.E.2d at 816. Like with the other evidence of the hearing, any potential unfair prejudice could be cured by an appropriate instruction—just like the trial court gave in this case. *See id.*

In fact, neither the trial court nor the State at trial identified any unfair prejudice that would arise out of allowing the jury to hear the context of Dr. Wolfe's 2020 testimony. On appeal, the State unhelpfully contends allowing the jury to hear that the State wished to forcibly medicate Defendant might bias the jury against the State. It is true, Defendant's evidence might have hurt the State's case—but that is not *ipso facto* unfair. It is what usually happens in a trial. The State further argues that Defendant began taking his medication voluntarily after the *Sell* hearing. That, however, does not change the fact the State—supported by its expert witness— advocated for forced medication of Defendant to restore his competency prior to a trial at which the State argued—and the very same expert testified—Defendant was malingering and feigning his mental illness. As yet, nobody has articulated any actual unfair prejudice or potential confusion to the jury justifying exclusion under Rule 403. To exclude this piece of evidence—this important context—was an abuse of discretion and constituted error.

In *Bundridge*, our Court held the exclusion of a trial court's order deeming the defendant incapable of proceeding was harmless error. However, critical to that analysis was the fact multiple experts and lay witnesses "placed before the jury a complete history and description of defendant's mental condition." *Bundridge*, 294 N.C. at 51, 239 S.E.2d at 816. Here, because of the exclusion of evidence the State and Dr. Wolfe sought an order compelling Defendant's forced medication improperly limited the history and description of Defendant's mental condition before the jury.

In the end, this was a close case, and Defendant had the right to place before the jury testimony through cross-examination of the State's expert having a tendency to throw light upon Defendant's mental condition. On the issue of Defendant's insanity, the case was primarily a battle between the Defense and State's respective experts. It is evident that substantial evidence in the Record supports Defendant's insanity defense and that this was the critical issue the jury struggled with—as illustrated by the jury's notes and initial indication it was hung. There is a reasonable possibility that, had the jury heard the context for Dr. Wolfe's 2020 *Sell* hearing testimony, it would have reached a different result. N.C. Gen. Stat. § 15A-1443(a) (2021); *See State v. Duncan*, 244 N.C. 374, 379, 93 S.E.2d 421, 424 (1956); *see also Bundridge,* 294 N.C. at 59, 239 S.E.2d at 821 (Exum, J. dissenting) ("Who knows, however, how much evidence it takes to persuade a jury? They might well have been persuaded by the evidence offered plus the evidence which defendant should have been allowed to offer but which the trial judge improperly kept out.").

Thus, the trial court exclusion of testimony regarding the purpose of the *Sell*

hearing was prejudicial error.  Therefore, Defendant is entitled to a new trial.